[Civ. No. 1468.   Third Appellate District.—June 2, 1916.]

JOAQUIN FONTS, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Appellant.

NEGLIGENCE—UNLOADING OF STEEL SHAFTING FROM FREIGHT-CAR—METHOD OF REMOVAL—CARELESSNESS OF FOREMAN—FAILURE TO GIVE WARNING AS TO INTENTIONS.—A railroad company is liable in damages for personal injuries received by an employee of a traction company, who had been loaned to it for the purpose of assisting its section foreman in unloading a heavy and unwieldy steel shafting from a freight-car to the station platform, where such injuries were occasioned by the act of the foreman in raising the shafting on

to the steel apron connecting the car door with the platform, which caused the shafting to slide and fall, without first giving the plaintiff or any of his assistants notice of his intentions so to do.

ID.—EVIDENCE—PROPER METHOD OF UNLOADING—OPINION OF EXPERIENCED DRAYMAN.—In an action for damages for such injuries, the opinion of an experienced drayman accustomed to handling heavy and cumbrous materials of all kinds is admissible as to the proper or more skillful way of removing such shafting.

ID.—RULES AND METHODS OF WORK—DUTY OF MASTER—PROPER INSTRUCTION.—In such an action an instruction is not inapplicable that it is the duty of the master to exercise reasonable and ordinary care to adopt "safe rules" and methods of work, and that such duty is one that cannot be delegated in such a manner as to relieve the master from responsibility therefor.

ID.—DUTY TO GIVE WARNING—UNOBJECTIONABLE INSTRUCTIONS.—The reading to the jury of several instructions in which it was stated, in substance, that, if they believed from the evidence that the method adopted for unloading the shafting was a perilous one, and "that the perils of the method so adopted were known to defendant's foreman before or at the time of the accident, and believe that the plaintiff did not know and in the exercise of reasonable care should not have known of such peril, then it became the duty of such foreman or boss to notify the plaintiff thereof, and if you believe from the evidence that the plaintiff was injured solely by reason of such failure of duty to notify the plaintiff, then in that case I instruct you that your verdict must be against the defendant and for the plaintiff," is not subject to the objection that thereby the court unqualifiedly and plainly told the jury that the duty to give warning rested on the defendant.

APPEAL from a judgment of the Superior Court of Alameda County, and from an order denying a new trial. William H. Waste, Judge.

The facts are stated in the opinion of the court.

A. A. Moore, Stanley Moore, George K. Ford, and Wilder Wight, for Appellant.

Robinson & Robinson, and Harry L. Price, for Respondent.

THE COURT.—Appellant has not pointed out any inaccuracy in the statement of facts as made by respondent, and it may be accepted substantially as the basis for a consideration of the legal questions argued by counsel. That statement, as far as any conflict exists, is the deduction from the testi-

mony favorable to respondent, but, of course, no valid objection on that account can be urged to our according it full credit, since it is not inherently improbable. The action was on account of personal injuries received by plaintiff while in the employment of defendant in assisting in the removal of a steel shafting from a freight-car to the station platform, and resulted in a judgment in his favor for three thousand dollars. Plaintiff was in the general employment of C. L. Best Gas Traction Company as a molder's helper, and had been loaned to defendant for the special work in which he was engaged when injured. He had been employed for only a few days by said traction company before the accident occurred. Said shafting was about twenty-one and one-half feet long, six inches in diameter, and weighed about one thousand five hundred pounds. It was smooth and round and was to be used for axles for traction engines. It was in a boxcar placed on a sidetrack near Elmhurst station and was a part of a shipment which it was the duty of defendant to unload. A few days prior to the accident, one Charles Forsyth, defendant's section foreman, had tried to unload the piece of shafting with the aid of three other men, but found it was too heavy for them to handle. He therefore notified the agent at said station that he needed more men. Said agent then telephoned to said traction company for more men. Accordingly, two more men were sent, but the·six were unable to lift the shafting, and, upon request, plaintiff and another man were sent. Mr. Forsyth had sole charge of the men and was boss of the operation of unloading. The eight men were not able to lift the bar from the floor so as to carry it out of the car. Before the accident one of the workmen informed said station agent that the bar was too heavy for the men to handle. The eight men, however, after great effort, succeeded in lifting one end up to and through the window at the end of the car. The bottom of the window was about three feet and seven inches from the floor of the car and was covered with a smooth piece of steel. The car floor was entirely of wood. The end of the shaft was pushed about three feet through said window, with the other end resting upon the wooden floor about four feet from the car door. Mr. Forsyth, with a "pinch-bar," proceeded to move the lower end of said shafting toward said door, moving it about two inches at a time. There was an "apron"

consisting of a steel plate placed between the car and the station platform, connecting the open car door with the platform below. The station platform was several inches below the car floor, so that the steel apron was inclined at about the same angle as the shafting. The end of the steel apron extended above the car floor, so that a person attempting to pinch the shafting on to the apron would be required to raise the bar several inches. This inclined steel apron had been used a great deal and had been worn smooth. While Mr. Forsyth was thus pinching the bar, the eight men were distributed along in close proximity to it, some on each side, plaintiff with two or three others having their backs toward the car door. Plaintiff occupied a position at the greatest distance from Mr. Forsyth, being at the end and corner of the car. At the time of the accident someone was looking for rollers to place under the shafting so that it could be rolled out of the car. Before, however, the rollers could be obtained, Mr. Forsyth, without giving any warning, raised the bar on to the steel apron. It is stated by appellant that it is obvious that "the bar would slip when the end Forsyth was prying reached the steel apron. We all know that iron produces but little resistance upon iron." The shafting gave an instantaneous jump, slid for an instant, and came down like a shot. The helpers were surprised and several of them narrowly escaped injury, plaintiff having his foot and toes mashed and his body severely bruised.

The gist of plaintiff's claim from the foregoing facts is that, "Defendant company failed to supply Forsyth with sufficient men to properly lift the bar down. Forsyth failed to warn the men of what he was going to do, but instead allowed the men to remain grouped around the shafting while he kept his intentions entirely to himself, raised the bar on to the steel shafting, and caused it to fall down. Forsyth failed to explain to his men the method of work he was going to follow, and allowed all of them to believe that he would cease pinching before the shafting reached the apron and to believe that the bar would be lifted down from the car window rather than to be suddenly precipitated to the floor. He alone knowing that he was going to put the smooth steel shafting upon the smooth steel apron failed to take reasonable or any precautions to prevent this slippery piece of smooth shafting from falling upon the men grouped around it. The

recklessness of this act is shown by the fact that the operation of tying a piece of rope around the center of the shafting and fastening the rope around the drawhead of the car would have absolutely prevented the shafting from falling."

We think in the particular thus pointed out by respondent there is presented a sufficient case of negligence, within the purview of the authorities, to warrant the finding of the jury In fact, it appears to us that Forsyth is chargeable with a high degree of carelessness in failing to give warning to the workmen of his intention. Of course, he may have believed, and had cause to believe, that they were not ignorant of his purpose, but we cannot so accept the facts. The want of knowledge on the part of plaintiff and the failure of Forsyth to apprise him of what the foreman intended to do seem to be the vital features in the case as far as the liability of defendant is concerned.

Appellant argues, with force and zeal, that the danger was so obvious that the injury must be said to be the result of respondent's own gross and stupid negligence. This view, however, assumes that he had knowledge of the conditions that made the danger imminent and manifest. This assumption, however, as we view it, constitutes the false premise in appellant's argument. There is room for the inference, let us repeat, that not only did plaintiff have no intimation or knowledge that Forsyth intended or was about to raise the end of the bar on to the apron, but he had reason to believe that an entirely different method would be adopted.

In addition to the foregoing contention many points are made by appellant, some of which, presented in the opening brief, are apparently abandoned in the closing argument, and will, therefore, receive no specific attention.

Among the incidents of the trial—quite out of the ordinary, we should say—is what respondent denominates the "fainting episode." Plaintiff, while on the witness-stand, lost consciousness and fell from his chair. The contention in brief is that this circumstance must have excited the sympathy of the jury, which controlled, or at least influenced, their verdict. In the morning he had been on the stand for some time, within which he had exhibited his injured foot to the jury. In the afternoon he had undergone a searching cross-examination for probably an hour when the unfortunate incident occurred. Defendant did not complain of it for sev-

eral days thereafter, nor is there any contention that the plaintiff was not fully cross-examined after he recovered from his indisposition.

Respondent charges the incident to the menacing conduct of appellant's counsel, and claims that if any detriment was suffered thereby they are responsible for it. It is also argued that, under the peculiar circumstances developed by the cross-examination, the temporary collapse of the witness probably injured his own cause rather than that of his adversary. From a reading of the record we are not justified in holding that there was anything improper in the conduct of said counsel, but we can readily understand how a plaintiff, unacquainted with court proceedings, nervous from sickness and suffering, unfamiliar with our language and naturally timorous under the influence of a strange judicial investigation, might necessarily misconstrue what was said and done, and be affected thereby as grievously as is claimed. However, we need not pursue the subject, as, of course, we cannot say that the verdict of the jury was influenced thereby. The presumption is, manifestly, that they regarded their oaths and determined the cause according to the law and the evidence. If there had been simulation on the part of plaintiff or other intentional misconduct, the case would be obviously different. But to grant a new trial in consequence of the unavoidable illness of plaintiff, sudden though it be and in the presence of the jury, would certainly be something novel in the history of judicial proceedings.

One of the considerations in the case treated most seriously grows out of the action of the court in overruling the objection of appellant to a question propounded to one James Henneberry, an experienced drayman. The interrogatory is of considerable length, reciting the facts as to the freight-car, the length and weight of the shaft, its position resting upon the window and the floor of the car, the position of the sheet-iron apron, the act in moving the lower end of said shaft toward the door of the car and culminating in throwing said shaft on to said apron, nothing else being done in the way of anchoring the shaft or preventing it from slipping, and concluding: "That on either side of this piece of shafting were stationed seven men, besides one who was doing the prying with that bar; it being the plan, after having lifted this shaft into the window, to take it down

again in the manner in which they had raised it, that is, by the men themselves. Would you say, under the circumstances, that was a proper mode of taking the shaft from the car?'' The objection was that "it is not a fair statement or a hypothetical question; also because the matter is not the subject of expert evidence. It does not lay within the domain of expert evidence at all.'' The answer was: "I do not think so.'' A similar objection was also overruled to the following question: "What reasonable precautions could have been exercised in order to prevent this shaft slipping through and from the window and falling to the floor, as it did, as detailed in my question?'' The answer was: "The simple method would be to lash it to prevent it from slipping. Just lash a piece of rope around about the center of the shaft, and a couple of men take hold of the end of the rope, prevent it slipping out of the door.'' The witness further explained, over objection: "I would have blocked up under the shaft on the floor of the car. That would be the proper precaution to prevent it from falling to the floor, to put some blocks across here, which would also be underneath that piece of shafting, and after it was pried to the door, to have the block with the end on rollers, to get it out afterward.''

The first objection going to the hypothetical character of the question is not pressed, and we may pass it by with the remark that a basis for the question is found in the record. The second objection, viz., that the matter about which the witness was asked to give his opinion is not among those subjects as to which expert testimony is necessary and allowable, is not, in our opinion, well taken. The general rule is, of course, "that the opinions of witnesses are never to be received as evidence where all the facts upon which such opinions are founded can be ascertained and made intelligible to the court or jury.'' (1 Greenleaf on Evidence, sec. 441b.) Or, as the proposition was clearly stated by Campbell, J., in *Evans* v. *People*, 12 Mich. 35: "Where the court or jury can make their own deductions they shall not be made by those testifying. In all cases, therefore, where it is possible to inform the jury fully enough to enable them to dispense with the opinions or deductions of witnesses from things noticed by themselves or described by others, such opinions or deductions should not be received.''

The general test, then, is: Is the matter upon which the opinion of a witness may be asked one as to which the jury themselves are capable of forming a judgment from a description thereof by other witnesses? And, measured by this test, we are inclined to the belief, as before stated, that the opinion of the witness in this case as to the *proper* or the more skillful mode of removing, down an incline, a heavy, cumbrous, and unwieldy steel shafting, such as the one described in this case, from a freight-car to the station platform, was not only proper but necessary to a correct solution by the jury of the ultimate question whether the plaintiff's injuries were sustained through the negligence of the defendant by its employee in immediate charge of the work. As seen, the shafting was smooth and round, and weighed about one thousand five hundred pounds. Quite naturally, when raised to an inclined position, it would easily slide downward, and, if not properly handled, with suddenness and great force. This would particularly be the result where, as here, the smooth iron or steel shafting is moved on to and over a steel-plated apron, worn smooth by use, and inclined at approximately the same angle as the shafting itself. It is, therefore, plainly manifest that no person but one accustomed to the handling of such heavy and unwieldy materials would know precisely the proper method which, under all the circumstances shown here, ought reasonably to be adopted for the removal of such a piece of iron or steel of the heft and unwieldiness of the shafting in this case from one place to another with safety to those engaged or employed in the work of such removal, where, as in the present case, the removal required the shunting of the iron down an incline to the place to which it was to be removed. How such removal is to be accomplished with safety to those engaged in the work of removal is a matter which can, obviously, be the better determined by those who have had experience in the handling of ponderous and unwieldy materials. It is extremely doubtful whether the average juryman or average judge would be able to say, from the manner of the removal of the shafting from the freight-car to the platform as described by witnesses in this case, whether the method so shown was the proper method for its removal to insure the protection of those engaged in so removing it against injury or misadventure of any sort.

As shown, the witness, Henneberry, was an experienced drayman, and as such had been accustomed to handling heavy and cumbrous materials of all kinds. By this experience he undoubtedly acquired a skill in the loading and unloading of heavy freight under a variety of circumstances which a person having no such experience could not be expected to be possessed of. Necessarily a person of such experience would know much better than one having no such experience how to proceed in such a case, and to prosecute the work of removal according to that method which his experience had taught him was the safer or the less attended by danger to those actively connected with the work. And necessarily, therefore, his opinion as to the proper method of carrying on the work would be superior to that of the jury founded upon the testimony of witnesses who had given only a general description of the circumstances under which the work of removal was attempted. It hence follows that the matter upon which the witness was permitted to express his opinion was not one within the common knowledge of men, and that the testimony was proper and necessary to an enlightened consideration and a correct disposition of the ultimate issue.

The conclusion thus reached upon this point is, we think, sustained by the cases. A few of these we may well refer to.

In *Dyas* v. *Southern Pacific Co.*, 140 Cal. 296, [73 Pac. 972], the plaintiff was injured by an insecure derrick, and the court held that "derricks, being of such limited use and complicated construction that an ordinary person is not familiar therewith, civil engineers of long experience who are familiar with the mechanical principles on which they are constructed and operated and with their strength and use, are competent to testify as expert witnesses in relation thereto and as to the sufficiency and security of the counterbalancing and fastening of the derrick in question." The case is an instructive one, and sets forth clearly the principle upon which such evidence is admitted.

*Snyder* v. *Holt Mfg. Co.*, 134 Cal. 324, [66 Pac. 311], was an action for personal injuries, caused by reason of the separation of a defective bolt and nut used to connect the header and separator in a sidehill combined harvester, manufactured for and sold to the plaintiff by the defendant, and it was held that "the question whether the bolt and nut were proper and

30 Cal. App.—41

sufficient for the coupling together of the parts of the harvester is peculiarly one for the evidence of a qualified expert, experienced in the construction of such machinery for the purpose intended.''

In *Silveira* v. *Iversen,* 128 Cal. 187, 190, [60 Pac. 688], it was held proper to ask a witness: ''How can it be determined, Mr. Erickson, whether a rope has become rotten and unsound?''

In *Callan* v. *Bull,* 113 Cal. 593, [45 Pac. 1017], plaintiff was injured through the negligent construction of a jetty, and witnesses were called as experts in his behalf for the purpose of showing that the structure to which a certain mat was suspended was not properly constructed to sustain the weight of the mat, and also to show what weight a cap of the dimensions of the one in question would sustain. These questions were objected to by the defendant, upon the ground that it was for the jury to determine, from the facts that might be shown in the case, whether the structure was properly made. But the supreme court said: ''These objections were properly overruled. The matters sought to be shown by these witnesses . . . were matters not presumably within the common knowledge of men, and were eminently proper to be shown by those who had made these subjects a matter of special study. (*Prendible* v. *Connecticut River Mfg. Co.,* 160 Mass. 131, [35 N. E. 675].)''

In *Howland* v. *Oakland Consol. St. Ry. Co.,* 110 Cal. 513, [42 Pac. 983], expert testimony was admitted as to whether defendant's car could, with proper care and attention, have been stopped in time to avoid a collision and the supreme court said: ''Nor is there any question but that the subject was one upon which the opinion of the witness was admissible. The manner of running electric cars, their rate of speed and the facility with which they can be stopped or handled, is not a matter of such common knowledge that the jury could judge as intelligently as one skilled in their use. It was, therefore, proper to resort to expert evidence.''

*Mulholland* v. *Western Gas Construction Co.,* 21 Cal. App. 44, [131 Pac. 110], involved personal injuries through the explosion of a scrubber in a plant, and a witness was permitted to answer over objection these questions: ''Is it proper, considering the safety of employees, to equip a scrubber without steam pipes?'' ''What is necessary to make a plant reason-

ably safe for the protection of the plant?"  "Is the steam pipe necessary for the safety of the men in and about the plant?"   It is true that the court said that "if his answer as to what would be a safe way to equip a scrubber stood alone without explanation, we should be inclined to hold that the overruling of objection thereto was prejudicial error," but the witness gave the reasons for his conclusion, and this rendered innocuous the form of the question, so the court held, intimating, however, that it was so largely a matter of discretion with the lower court, that if the ruling had been the other way, it would not have been error.

In *McLain* v. *Dahlstrom Metallic Door Co.*, 19 Cal. App. 475, [126 Pac. 391], plaintiff was injured by an insecure elevator, and it was held that the lower court properly allowed evidence to show the insecurity of a knot such as that shown, and the mode of tying knots in such a way as to prevent slipping and accident, which is proper matter of skill, and to show the weakness which was apparent from an inspection of the insecure knot, if had.

In *Colsh* v. *Chicago R. R. Co.*, 149 Iowa, 176, [Ann. Cas. 1912C, 915, 34 L. R. A. (N. S.) 1013, 127 N. W. 198], it was declared that expert testimony is admissible on the question of the proper loading of livestock in a car.

In *Leslie* v. *Granite Ry. Co.*, 172 Mass. 468, [52 N. E. 542], it was held that an expert can testify as to the methods of handling heavy stones with a derrick.

In *Smith* v. *Dow*, 43 Wash. 407, [86 Pac. 555], the court declared that an expert may state that the method used in tying lumber for hoisting was not safe.

In *Palmquist* v. *Mine & Smelter Co.*, 25 Utah, 257, [70 Pac. 994], it was held, in an action for personal injury alleged to have been sustained in moving a boiler, that expert evidence as to the proper method of moving boilers and the appliances ordinarily connected therewith is competent.

For further illustration of the application of the rule permitting opinion testimony, we refer to the following cases: *Zarnik* v. *Reiss Coal Co.*, 133 Wis. 290, [113 N. W. 752]; *Alabama So. Ry.* v. *Vail*, 155 Ala. 382, [46 South. 587]; *O'Brien* v. *Look*, 171 Mass. 36, [50 N. E. 458]; *Wolfe* v. *Mosler Safe Co.*, 139 App. Div. 848, [124 N. Y. Supp. 541], a case which, on its facts, is strikingly similar to the case at

bar; *Meiley* v. *St. Louis & S. F. Ry. Co.,* 215 Mo. 567, [114 S. W. 1013].

Counsel for the appellant cite many cases which, they insist, support the view that the opinion of the witness, Henneberry, was upon a matter within the knowledge of the jury, or, in other words, not within the range of those subjects upon which the opinions of experts may be received. We need not take the time to review herein all those cases. It is sufficient to say that we have carefully read them and found no difficulty in distinguishing them from the present case. The facts are wholly different from those of this case. The opinion testimony which had been allowed by the trial courts in those cases and which the appellate courts held to be incompetent and inadmissible related to ordinary matters as to which the average person could form a correct opinion without the aid of the opinion of those claiming to have had special experience in such matters. For instance, it was held by the supreme court of Iowa that the opinion of a witness as to the number of men necessary properly and safely to move a locomotive tender loaded with coal by means of a pinch-bar was upon a matter which the jury themselves were competent to determine from a simple statement of the facts. (*Cahow* v. *Chicago Ry. Co.,* 113 Iowa, 224, [84 N. W. 1056].) And likewise, in an action wherein the plaintiff set up personal injury through the negligence of the defendant in not properly securing pipe which was being hoisted in bundles of six, it being claimed that the defendant had negligently failed to place bagging at the end of the bundle, and thus secured it so as to prevent the single piece from falling out, it was held that the opinion of a witness that the pipes were properly fastened was not admissible, the matter upon which such opinion was given not being such as to require the opinion of an expert. The court said that "the witness could properly state the relative efficiency of different methods of hoisting the pipe; but when he was asked to state whether it was necessary in the proper performance of a duty, to attach bagging to the end of the pipes, he was asked a question which the jury could determine upon a statement of simple facts." (*New York Electric Co.* v. *Blair,* 79 Fed. 896, [25 C. C. A. 216].)

In the present case, it will be noted, the witness was not asked how many men would be required to move the shafting properly and with safety; nor (it may be added) was he asked

whether the method adopted for the removal of the shafting was unsafe or characterized by inherent or other negligence. He was, as seen, merely asked if the manner in which it was attempted to remove the shafting as shown by the testimony of the witnesses was the proper way to do the work, which, it is clear (as counsel suggest) involved certain complex operations. And he not only declared that the method adopted was not the proper way of handling the heavy and cumbrous article under the circumstances, but (as an expert should) explained the reasons for his conclusion. In brief, the whole sum of the witness' testimony was the expression of an opinion upon the relative efficiency of different methods of unloading and removing the shafting. (*New York Electric Co.* v. *Blair,* 79 Fed. 896, [25 C. C. A. 216].)

Counsel for the defendant, Southern Pacific Company, devote considerable space in their briefs in criticism of the alleged refusal by the trial court to grant their client's alleged motion for a nonsuit. But a simple reply to the extended argument addressed to that proposition is to be found in the fact that while it appears that a motion for a nonsuit was made by the corporation, C. L. Best Gas Traction Company, which was joined with the Southern Pacific Company as a party defendant, and the same granted, it nowhere is made to appear in the record that the Southern Pacific Company made any such motion.

The next assignments involve attacks upon certain portions of the court's charge to the jury and upon the action of the court in refusing to allow certain instructions proposed and requested by the defendant.

The first of the given instructions to which objection is made reads: "I instruct you that it is the duty of the master to exercise reasonable and ordinary care to adopt safe rules and methods of work, and that this is a personal duty which the master owes to its servant, and which cannot be delegated or transferred to another in such manner as to relieve it, the master, from responsibility thereof."·

That said instruction contains a correct statement of a legal principle in the abstract, there can be no doubt; and we are unable to perceive why it is not a rule which may appropriately be stated in almost any case of personal injuries, where the latter are alleged to have been sustained by a servant through the negligence of his master while such servant

is engaged in the performance of duties the execution of which is attended by more or less danger to the employee.

It has been declared by the text-writers and uniformly held by the courts that "it is the duty of railroad companies to exercise reasonable care in the matter of safeguarding and protecting their employees while engaged in the discharge of their duties as such against the negligence of common employees, or their own negligence through the operation of cars or other machinery, and to that end make, promulgate, and enforce reasonable rules for the government of their employees in the performance of their duties as such." (*Payne v. Oakland Traction Co.*, 15 Cal. App. 127, 144, [113 Pac. 1074, 1081], and the authorities therein cited.) Of course, this rule is applicable only where the master is engaged in a complex or dangerous business, or a business the carrying on of which is, by reason of its intricate character and other conditions, itself dangerous to employees engaged in the work of actually prosecuting it; and, manifestly, whether in any particular case such rules should be made and promulgated must depend upon the nature or character of the business and the conditions necessarily surrounding the prosecution thereof.

But even if this were a case to which the rule above mentioned is not strictly applicable, we yet are unable to perceive in the instruction anything which renders it inapplicable to this case; for, as we read and construe it, the instruction, as before suggested, merely states a principle of law quite pertinent to nearly all cases in which an employee claims damages for personal injuries received while engaged in the performance of work for his employer. There, clearly, can be no doubt that, in any case, it is the duty of the master to use and employ all reasonable precautions for the safety of those in his service, and to that end provide his employees with the safest reasonably available methods and means which may be employed for carrying on the work. (*Bush v. Wood*, 8 Cal. App. 647, 656, [97 Pac. 709]; *Buzzell v. Laconia Man. Co.*, 48 Me. 113, [77 Am. Dec. 212], and cases therein cited.) And this is in effect all that the above instruction declared to the jury. If the word "rules" was omitted from the instruction, no possible question could arise as to the applicability of the instruction to this or (as before suggested) almost any other case of personal injury which was sustained by a servant while prosecuting work assigned to him by his em-

ployer. We cannot see, however, that the use of the word "rules," unaccompanied by a full exposition of the rule requiring in certain circumstances employers to adopt, promulgate, and enforce rules for the guidance of their employees while actually engaged in the discharge of the duties of their employment, makes the instruction say anything more than what it would have imparted to the jury with that word eliminated. What the instruction really means and was undoubtedly intended to convey was, not that it was the duty of the company to promulgate and enforce set rules according to which the unloading of cars should uniformly be carried on (a course which, in its application to work so varied in character, it would at least seem is not feasible or practicable), but that, as to the particular work in hand, because of its rather intricate character, it was the duty of the defendant to furnish its employees employed in the work with proper appliances and to point out the proper method for performing it with safety to themselves. In short, the instruction, justly and rationally construed by the light of the connection in which it is applied, simply means that it is a duty legally resting upon the master to adopt that method for the performance of the particular work which, considering the nature of the work and the circumstances under which it must be performed, will be the less likely to endanger the lives or limbs of the employees engaged in performing it. As so construed, and as no doubt the jury so understood it, the instruction, as before stated, merely declares a general principle applicable to the relations existing between master and servant, and announces one of the general duties owing from the former to the latter. What less than this could reasonably be expected or required of an employer in any case or under any circumstances, we are unable to conceive.

The next complaint of the appellant is aimed at the action of the court in reading to the jury several instructions in which it was stated, in substance, that, if they believed from the evidence that the method adopted for unloading the shafting or bar in question from the car was a perilous one, and "that the perils of the method so adopted were known to defendant's foreman before or at the time of the accident, and believe that the plaintiff did not know and in the exercise of reasonable care should not have known of such peril, then it became the duty of such foreman or boss to notify the plain-

tiff thereof, and if you believe from the evidence that plaintiff was injured solely by reason of such failure of duty to notify the plaintiff, then in that case I instruct you that your verdict must be against the defendant . . . and for the plaintiff.''

One of the grounds of objection to the above instruction and others addressed to the same proposition is that thereby the court unqualifiedly and plainly told the jury that the duty to give warning rested on the defendant. It is further claimed that the instructions were wholly inappropriate to this case, since (so it is argued) the danger attending the act of unloading the heavy and unwieldy bar was so obvious that such danger must have been plainly patent to the plaintiff and the other workmen assisting in the work; hence, so it is urged, the instructions must be assumed, and held to have unduly influenced the jury against the defendant.

We are not prepared to acquiesce in the propositions so stated. A reading of the instructions will readily disclose that there exists no tangible ground for declaring that they did not fairly and plainly submit to the sole determination of the jury the question whether the facts were such as to have placed upon the defendant the duty of warning the plaintiff of the perils or hazards of the work in which he was temporarily engaged.

As to the second ground of objection to the instructions, we perceive no necessity for entering into an analysis of the situation as it is presented here to show that the doctrine of warning was, as we believe is true, pertinent to this case. Briefly, we may observe that there are considerations exposed by the evidence upon which the propriety of such instructions in this case may well and reasonably be maintained. The plaintiff, however, relied upon general negligence as well as upon alleged special acts of omission on the part of the defendant which constitute actionable negligence. The verdict is amply supported upon the theory of the general negligence set up in the complaint. Therefore, even if it were true and necessary to declare that warning by the foreman to the employees of certain unexpected perils necessarily arising in such a case, and which perils are obvious to experienced persons, but not so to the one inexperienced in such work, as the evidence shows the plaintiff to have been, was not among the duties legally resting upon the defendant in this case, yet, after an examination of the entire cause, including the evidence, we

cannot justly say that the error in giving the instructions upon that subject, if error it was, has resulted in a miscarriage of justice. (Const., art. VI, sec. 4½.)

Counsel for the appellant concede that no just fault can be found with that portion of the court's charge in which it was declared that, if the C. L. Best Company loaned the plaintiff to the Southern Pacific Company for the special service of unloading the iron bar, and that the plaintiff came under the sole power of control and direction of the latter company, and that plaintiff expressly or impliedly consented thereto, then and in that event the plaintiff for the time being became the servant of said Southern Pacific Company; but they insist that the court erred to the prejudice of their client by refusing to state the converse of that proposition as proposed in their own language. But, as we read the instruction upon that subject as proffered by the Southern Pacific Company, it goes further than merely to state the converse of said rule upon a hypothetical or assumed situation for which there might be support in the evidence. It would have told the jury unqualifiedly and unconditionally that, upon the case as made, the plaintiff was not an employee and under the control of the Southern Pacific Company. Clearly, the instruction as so proposed is inconsistent with the one given, entered upon the domain of fact, and was properly refused.

Objections are urged against some other instructions dealing with other questions arising in the case. To these we deem it unnecessary to give special attention herein; for as to the action of the court with reference to the instructions, it is enough to say generally that we have carefully examined the entire charge of the court and have found that, generally speaking, it states all the principles of law pertinent to the issues with accuracy and clearness. And for this reason there is no ground for holding that the court erred in rejecting certain instructions proposed by the defendant. It is obviously true that a principle or rule of law, pertinent to the issues and once stated, is not required to be repeated in other portions of the charge. The rejected instructions in effect merely embraced a repetition of principles in different forms of language which the court announced and submitted to the jury.

The judgment and the order are affirmed.