[Civ. No. 19100. Second Dist., Div. One. Apr. 14, 1953.]

ELIZABETH A. ERVIN, Respondent, v. THE CITY OF LOS ANGELES, Appellant.

Ray L. Chesebro, City Attorney, Bourke Jones, Assistant City Attorney, Joseph N. Owen and Weldon L. Weber, Deputy City Attorneys, for Appellant.

Betts, Ely & Loomis and Forrest A. Betts for Respondent.

WHITE, P. J.—Defendant city of Los Angeles appeals from a judgment entered upon a verdict in favor of plaintiff who was injured by a falling boulevard stop sign located on the southeast corner of Hollywood Boulevard and Sycamore Avenue in said city. The action is predicated upon the Public Liability Act of 1923, formerly Statutes 1923, page 675, section 2, now Government Code, sections 53050 and 53051.

The boulevard stop sign in question was a redwood post about 4″ x 4″ in girth and approximately 8 feet high. It was embedded in the concrete of the sidewalk on the southeast corner of the aforesaid intersection. A 24-inch octagonal metal sign was attached to the top of the post with the word "stop" printed in black letters on its face.

On November 12, 1948, at about 4 p.m., plaintiff walked west on the south side of Hollywood Boulevard to a point on the southeast corner of the intersection of the aforesaid streets. As she was about to step down onto Sycamore

Avenue the traffic stop sign embedded in the sidewalk on that corner fell upon and injured her very seriously.

The cause proceeded to trial before a jury resulting in a verdict for plaintff in the sum of $37,774.50. Defendant's motions for nonsuit and a directed verdict were denied, as was its motion for a new trial. This appeal from the judgment followed.

Appellant city strenuously insists that the record is barren of any evidence to bring home to it a neglect of its duty of inspection or knowledge of facts which would have put it upon inquiry (*Nicholson* v. *City of Los Angeles,* 5 Cal.2d 361, 367, 368 [54 P.2d 725]). That the record fails to disclose any showing that the city possessed either actual or constructive notice of a dangerous condition in respect to the stop sign above referred to. And, that the record is bereft of any evidence showing the lapse of a reasonable time within which the city could have remedied the defect had it possessed such knowledge.

Respondent, on the other hand, contends that the record discloses evidence that the signpost had been damaged for quite some time (nine or ten months) prior to the happening of the accident, and that the damage had left approximately one-half of the pole cracked or fractured prior to the time it fell upon her. That the photographic pictures of the post revealed an indentation several inches above the fracture line, and that from these pictures the jury could conclude that the indentation had been painted over at some time prior to the date of the accident. That the conclusion naturally follows that the employee of the city who last painted the post had actual knowledge of the damage thereto, or at least, that the jury was entitled to conclude that the city employees "whose duty it was, according to the testimony of the defendant in this case, to report defects to the post, had such knowledge of the damage as to create constructive knowledge in the defendant city of the defect and of the danger which necessarily would be incident to a half broken post, carrying at its upper end a very heavy metallic boulevard stop sign."

The post in question was not produced at the trial. To explain its disappearance, defendant city offered the testimony of Maynard Trebil, a senior paint foreman in its employ, who testified that there are thousands of these signs throughout the city; that Walter A. Hudson, a paint foreman, brought the sign into the city shop where there was attached to it a white tag giving the location of the stop sign and

marked "hold"; that he had the post in his possession in the sign room for nine or ten months after the accident; that he had 20 or 30 people working around the warehouse and from time to time more people came; that some of them were not too well educated and could hardly read. That when in February, 1951, he was asked to produce the post, he made a thorough search for it, but was unable to locate it and did not know what happened to it.

Since the post could not be produced, the parties, jury and trial court were forced to rely entirely upon oral testimony and photographs for proof as to whether it was maintained in a defective condition occasioned by an old fracture of the post.

It is axiomatic that on appeal, all legitimate and reasonable inferences must be indulged toward upholding the findings or verdict of the trier of facts. If there be any reasonable doubt as to the sufficiency of the evidence to sustain the findings or verdict, appellate courts should resolve that doubt in favor of such findings or verdict. And, in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689]).

Having in mind the foregoing principles and remembering that it is the contention of appellant city herein that as a matter of law, no prima facie case was presented, viewing the factual situation in a light most favorable to respondent as we are required to do, we cannot hold that as a matter of law, appellant city possessed neither actual nor constructive notice of the existence of a dangerous condition in respect to the stop sign or that there was no lapse of a reasonable time within which appellant city could have remedied the defect had it possessed such knowledge.

There is in the record direct testimony that the signpost had been struck by an automobile nine or ten months prior to the happening of the accident here in question. This would support the conclusion by the jury that the indentation, which is established by the pictures of the post, possibly occurred some nine or ten months prior to November 12, 1948. While the jury might have concluded that the testimony of the witness who testified as aforesaid was weakened under the force of cross-examination and could have rejected it, nevertheless, the verdict would indicate that they accepted the testimony, as was their right in the capacity of triers

of fact. An employee of appellant city testified that on February 17th and 18th, 1948, he was at the intersection in question and painted the post involved in the accident.

Another witness testified that she was walking easterly on the south side of Hollywood Boulevard and when "about 4 or 5 doors" beyond the corner she heard a scream, turned and saw respondent lying on the sidewalk. This witness went immediately to the aid of respondent and with reference to the appearance of the signpost, testified that the break therein was "a dull, jagged break instead of perhaps long splinters." That about one-half of the bottom of the post stump appeared to be "sort of weathered—dull in color." Police Officer McDonald, a witness called on behalf of appellant city, was asked on cross-examination:

"Q. (By Mr. Betts, counsel for respondent): Did you make any observation whatever of that post above the black line for the purpose of determining whether or not there were old indentations or other marks of applied force to the post? A. Yes, I did.

"Q. Were there any? A. Yes, there were.

"Q. Can you describe them to us, Mr. McDonald? A. As I recall it, above the fracture on the post there *was an indentation* and also a discoloration that appeared to be the soot from the exhaust of a car." (Emphasis added.)

Another witness, Fred L. Wilke, testified that because of his business of "handling loans on construction jobs for most of my life," and checking upon such jobs, he was familiar with wood. He saw the post on the evening of the accident and again on the next day. The witness testified that the portion of the post in the ground protruded possibly 6 or 8 inches, and from his examination, "it showed a definite fracture . . ." He was then asked:

"Q. (By Mr. Betts): Well, *can you describe the color* of it? A. It appeared on one side of it to be darker in color than the other, and on one portion of the post in the ground it looked like a fresh break, fresh wood, like fresh wood would appear if you snap a piece of lumber. (Emphasis added.)

"Q. Fresh wood? A. Yes, like a fresh break.

"Q. And on the other side? A. On the other side it was discolored quite dark."

Stanley McDonald, a witness called on behalf of respondent testified that he was a lumberman of 31 years' experience and that he had become familiar with redwood used for boulevard stop signs. Because the post in question had been lost

as heretofore noted, neither end of the fractured portion thereof was available so that the jury might themselves determine whether or not the fracture was a visible one before it was painted over.

Over objection, this witness answered the following question:

"Q. May I ask you then this question—assuming that you had such a post and that it was placed in a cement sidewalk installation, such as the sidewalk here, and assume that it was painted with the regular black and white paint stripes, and that it had a portion at the bottom of it which would appear to me to be about 18 inches or two feet which was black; in other words, the stripes run down to a black solid portion at the bottom. A. Yes.

"Q. Now, assuming that you had such a post, and assume that at some time there was an accident in which the post was struck on the side so as to leave an indentation such as appears on the right-hand side of this post as we look at it, and several inches above the broken-off portion, and assume, however, that that blow did not knock the post down but assume that it did fracture and shatter the post so that it was broken at least halfway through the 4-inch square portion of it—I don't know what you call it, but half of it. Now, assume such circumstances. Now, can you tell us from your experience whether or not that fracture would be readily discernible by ordinary observation of the post, looking, standing close enough to it to see the post itself?

"The Court: The answer to that, Mr. McDonald, would be yes or no. You can tell whether or not it would be observable under the circumstances stated. A yes or no answer, please. A. Yes.

"Mr. Betts: Assume the same facts now, Mr. McDonald, and assume that the specific purpose of a person was to inspect the post to determine whether or not it had any defects in it, what would your answer be with reference to whether or not such an inspection would reveal the fracture? A. It would be readily observable.

"Q. (By Mr. Betts): And suppose that when you started out the upper part of it at least was painted, what would be the condition with reference to whether or not the fracture line would show through the paint—and assuming the same example that I have given, that you fractured the board— would the fracture line show through the paint? A. Do you

mean could you put it back in such a way that you could not see the fracture?

"Mr. Betts: Yes. A. I don't believe so, sir."

From the foregoing testimony it follows that if, as the jury had a right to find, there was a fracture through one-half of the post at the point of ultimate entire fracture, and if the one-half post fracture existed as of February 17th and 18th of 1948, there was no reason for the city painter Reed not to have seen it when he painted the post and for him not to have reported it as was his conceded duty.

The city painter, Mr. Reed, testified that he painted the yellow zone curbs adjacent to the post in question some two or three days prior to the accident, but as to whether or not he made any inspection of the stop sign post his answer was, "I cannot say definitely but I usually do that. I *may* have checked it." (Emphasis added.)

Concerning the question of appellant city's care in the inspection of the boulevard stop sign here in question, Maynard Trebil, senior paint foreman, testified that the records failed to show any inspection of that post at any time between 1937 and the happening of the accident on November 12, 1948. That there were approximately 70 painters in his department, that only six were charged with the duty of supervision and inspection of boulevard stop signs in the entire city of Los Angeles. That each individual post is inspected, "Yes, maybe each ten years. It is hard to say." That, "unless something appears to be wrong" as the inspector rides by he does not "get out" of his vehicle and examine the post.

Regulo Rodriguez, a painter for appellant city, replaced the broken stop sign post. He testified that when he arrived at the intersection in question he found, "a stub sticking out of the curb about 4 inches . . . I found the stub in very good condition." He further testified that it appeared to him "that the stub had a fresh break, and a clean break, with jagged ends sticking on the sides. . . ." On cross-examination, however, he testified:

"Q. (By Mr. Betts): Now, what do you mean by you don't recall—that you didn't see it or you don't recall whether it was or was not there. A. I didn't pay much close attention to the post.

"Q. That is what I thought. You don't know whether it showed a weatherbeaten appearance or not, do you, Mr.

Rodriguez? That is the truth of the matter isn't it? Just take your time on that. A. What I meant was, 'I didn't pay much attention to the post whether it was weatherbeaten or not.'

"Mr. Betts: That is right. I am trying to help you out on that proposition, that is exactly what I had in mind. You didn't pay enough attention to tell whether any portion of it was or was not weatherbeaten. That is the truth, isn't it? A. Yes."

With reference to the testimony of other witnesses that the mark about 6 inches above the break was an indentation, Police Officer Wagnon testified that it appeared not to be a fresh break and looked like a condition that was caused by "somebody that was down on their knees whittled on the post." The verity of this testimony was of course a question for the jury.

Walter A. Hudson, a traffic zone painter for appellant city, testified he had been handling redwood for six or seven years and had observed broken redwood posts. That the broken portion of the post here in question was "strong and in good condition"; that the break was "nice and clean," and that he saw no evidence of weathering.

Dean Harold Larson, a newsboy, 15 years of age, testified that he had worked on the corner with which we are here concerned for six months prior to the accident. That he customarily leaned against the post to relieve pressure caused by poliomyelitis, and had leaned against the post on the night before the accident. His weight was 145 pounds. The post always held his weight and did not appear to be broken or cracked until the morning of the day of the accident. On the morning of the day of the accident Larson, on his way to school, went to this corner in regard to his newsbox. He found it all broken up, pieces of it were lying beside the stop sign and some pieces were in the street. He also noticed for the first time that the post was cracked clear through and a piece of "grass string" was tied around it. He also testified that he saw automobile tire marks on the curb and on the street on the morning of the accident. That the tire marks on the street were 2 feet from the stop sign and were about 6 inches to a foot in length. He was an eyewitness to the accident and in his testimony stated that respondent was walking from west to east, while her testimony was that she was proceeding westerly to the point of the accident. It was also brought out in cross-examination of this witness that he

had never seen the damage and indentation on the post that is revealed in one of the pictures. The conflict in the evidence given by this witness with that of other witnesses was a question for the jury, as judges of the credibility of witnesses and the intrinsic weight of all the evidence.

The case of *Nicholson* v. *City of Los Angeles, supra,* we are persuaded is not controlling here. In the case just cited the court said at pages 367, 368, ''Because of the plaintiff's failure to bring home to the defendant city a neglect of its duty of inspection or knowledge of facts which would have put it upon inquiry, the city cannot be held to have had constructive notice of the defect and the judgment must be reversed.''

■ In the case now engaging our attention there is in the record evidence from which the jury could have concluded that the stop sign post had been damaged by an automobile colliding with it some nine or ten months before respondent was injured; that when in February, 1948, appellant city's painter, Mr. Reed, painted the post, the city acquired constructive, if not actual knowledge, of the post fracture. That the fracture had existed for a length of time sufficient to create a darkened and weathered appearance of one-half of the fracture line of the post; that there was a negligent failure on the part of the city to furnish an adequate method of inspection, or a sufficient number of inspectors.

While there was evidence in conflict with the foregoing, the jury, as they were entitled to do, resolved the conflict in favor of respondent. We believe the true rule on appeal to be that when reasonable minds may differ regarding the question as to whether defective conditions have existed for a sufficient length of time under the particular circumstances of a case, to charge a municipality with at least constructive knowledge thereof, the conclusion of the jury in that regard may not be interfered with by an appellate tribunal.

As was said by the trial judge in the case at bar when denying a motion for a directed verdict:

''The only effect, as I see it, of the defendant's case, is to increase the conflict that exists in the evidence. There still remains within the evidence this testimony to the effect that there was a portion of that post not in a rotten condiion but in a condition from which the jury can draw an inference that a break was there and that it had existed for

some considerable time. There is evidence in the record to
the effect that there was discoloration in at least half of the
break in that post which indicated weathering. Now, from
that the jury can draw an inference that that had existed
for a considerable length of time. From the nature of the
picture, Exhibit 14, they can draw that inference, and they
can take the testimony of Mr. Wilke. Mrs. Wilke's testimony was a little vacillating after counsel for the defendant
got through cross-examining her, but there is the testimony
of Mr. Wilke to the effect that that was an old break. There
was also that indentation on the face of the post, which the
photograph clearly shows, and there is testimony to the effect that that indentation was on there at a time before the
post was painted. I have forgotten who testified to that but
it is in the record, that that indentation was painted over,
whatever it may have been. So from that there is an inference that that thing had existed and there is an inference
that at least half of the break had existed for a time previous
to the time that the indentation was made. While the post
was not rotten—and no one has contended that it was rotten,
although the pleadings set that up—yet a 4 x 4 post that
is not rotten does not break and fall over unless some force
is applied to it. As to the time when that force might have
been applied to it, there is plenty in the plaintiff's case from
which the inference could be drawn that it had been there
for some time. I think it is a question of fact, . . .."

Appellant's contention that to find the city liable for damages under the facts of this case is to make it an absolute
insurer of the safety of persons using the public streets and
sidewalks, is answered by the following language used by
the court in the case of *Fackrell* v. *City of San Diego,* 26 Cal.
2d 196, 209 [157 P.2d 625, 158 A.L.R. 625]:

"Obviously, the city is not being held as an insurer of
anything but it is being held to the standard of ordinary
care in planning, constructing, and maintaining its streets
and sidewalks. Liability for its failure in that regard is
not due to the whimsy of court or jury; it is imposed by the
public liability statute."

We are satisfied that the record herein supports the findings of the jury that appellant city had knowledge or notice,
at least constructive, of the defective or dangerous condition
of the boulevard stop sign post, and for a reasonable time
after acquiring such knowledge, failed to take action reasonably necessary to protect the public against the condition

(*Fackrell* v. *City of San Diego, supra,* p. 206, 210; *Boyce* v. *San Diego High School Dist.,* 215 Cal. 293, 294, 295 [10 P.2d 62]; *Rafferty* v. *City of Marysville,* 207 Cal. 657, 660 [280 P. 118]; *Maddern* v. *City and County of San Francisco,* 74 Cal.App.2d 742, 749, 750, 752, 753 [169 P.2d 425]; *Sheward* v. *Virtue,* 20 Cal.2d 410 [126 P.2d 345]; *Heath* v. *Manson,* 147 Cal. 694, 701 [82 P. 331]; *Kirack* v. *City of Eureka,* 69 Cal.App.2d 134, 136, 137, 138, 140 [158 P.2d 270]; *Edwards* v. *City of San Diego,* 126 Cal.App. 1, 3 [14 P.2d 119]; *Christy* v. *City of Alhambra,* 9 Cal.App.2d 499, 501 [50 P.2d 454]; *Scarpaci* v. *City of Chicago,* 329 Ill.App. 434 [69 N.E. 2d 100]).

We have already referred to and distinguished the case of *Nicholson* v. *City of Los Angeles, supra,* mainly relied upon by appellant. Since each case must rest upon its particular circumstances in deciding whether a municipality can be charged with liability under sections 53050 and 53051 of the Government Code, suffice it to say that we find nothing in the remaining cases cited by appellant which militates against what we have herein held, under the factual background here presented.

Finally, appellant earnestly urges that it was prejudicial error for the trial court to admit, over the former's objection, the testimony of Stanley McDonald. The testimony given by this witness has been heretofore narrated and need not now be repeated.

It is appellant's contention that the questions propounded to Mr. McDonald were not properly the subject of expert testimony. That the facts from which his conclusion was to be drawn were not peculiarly within the knowledge of an expert but were matters of common knowledge, and that they were not facts which although they might be clear to the jury, the conclusions to be drawn therefrom depended upon knowledge or skill possessed only by an expert (*Long* v. *John Breuner Co.,* 36 Cal.App. 630 [172 P. 1132]; *Fonts* v. *Southern Pac. Co.,* 30 Cal.App. 633 [159 P. 215]; Code Civ. Proc., § 1870, subd. 9).

It is not easy to draw a clear line of demarkation between the field in which experts may give their opinions, and the field which is reserved exclusively for the jury. However, in the instant case, even though it be conceded that the testimony given by the witness McDonald does not come within the rule under which an expert may give his opinion, nevertheless, no prejudice to appellant resulted therefrom.

Witnesses for the latter were permitted to answer questions of the same tenor as those propounded to Mr. McDonald. Appellant city qualified some of its employees as experts in the field of timber and what could be determined from the observation of redwood. Police Officer McDonald was so qualified and thereafter testified concerning the sheen of redwood and the breaking off of a piece of redwood from the very post involved, and comparing it with the fracture he saw. Appellant's senior paint foreman, Maynard Trebil, was qualified as an expert and testified concerning the post in question—to the effect that there was no discoloration of the post, thus placing upon respondent the necessity of establishing the visibility of the fracture should the jury believe that it had existed for any considerable length of time. Walter A. Hudson, a traffic zone painter for appellant city, gave like testimony, such as, ''I just looked at both ends (of the post) and I said, 'there is a nice clean break' ''; that the post was ''just a good clean color of redwood,'' and that, ''it (the post) apparently looks perfectly O.K. to me, sir.'' That the broken portion of the post, ''appeared to be a good strong post.'' In the light of the foregoing testimony, coupled with the inability of appellant to produce the post at the trial, we are unable to say that the admission of Mr. McDonald's testimony amounted to prejudicial error (*Hurwit* v. *Prudential Ins. Co. of America*, 45 Cal.App.2d 74, 81 [113 P.2d 691]; *Bowen* v. *Sierra Lbr. Co.*, 3 Cal.App. 312, 318 [84 P. 1010]; *Humiston* v. *Hook*, 86 Cal.App.2d 101, 105 [194 P.2d 122]). ■ Frequently it happens that under the form of expert evidence answers are given that are so clearly a part of common knowledge that no injury results. When questions are asked that do not call for expert evidence, and the answers, as in this case, are correctly given, clearly, in the nature of things, no harm is worked (*People* v. *Durrant*, 116 Cal. 179, 217, 218 [48 P. 75]).

For the foregoing reasons, the judgment is affirmed.

Doran, J., and Drapeau, J., concurred.

A petition for a rehearing was denied May 4, 1953, and appellant's petition for a hearing by the Supreme Court was denied June 11, 1953.