[Civ. No. 14574. First Dist., Div. Two. Apr. 24, 1951.]

DAISY VAN DORN, Respondent, v. CITY AND COUNTY OF SAN FRANCISCO, Appellant.

Dion R. Holm, City Attorney, and Edward F. Dullea, Deputy City Attorney, for Appellant.

Leslie C. Gillen and John R. Golden for Respondent.

GOODELL, J.—Respondent sued for personal injuries and recovered a verdict and judgment for $14,056.60 against both defendants. The cable company abandoned its appeal leaving as the sole appellant the city, against whom the action was prosecuted under the Public Liability Act of 1923 (Stats. 1923, p. 675; 2 Deering's Gen. Laws, 1944, Act 5619).

On July 26, 1948, at noontime the respondent, a woman of 64, was walking westerly on the southerly side of Golden Gate Avenue in San Francisco, and while crossing Jones Street in the marked crosswalk she tripped at the westerly rail of the cable company's northbound track and was thrown with such force as to fracture her right shoulder. Other injuries were minor and soon cleared up.

That there was a depression of from 3 to 3½ inches at the spot in question is not disputed, but there was no testimony as to how long it had been there.

At that place there is a hatch containing underground cable pulleys which must be inspected (and perhaps oiled) twice a day, and in order to make them readily accessible the hatch is covered with short, removable boards of varying widths (mostly about 6 inches), laid between the rails and at a right angle to them. The sunken end of at least one of these boards, where it abuts the westerly rail of the northbound track, caused the depression which engaged the toe of respondent's left shoe.

The act provides, *inter alia*, that a municipality shall be liable for injuries resulting from the dangerous or defective condition of streets where the agency having authority to remedy such condition, had knowledge or notice thereof and then failed or neglected for a reasonable time to remedy it or take such action as may be reasonably necessary to protect the public against it.

Appellant presents but one point which is, as its counsel states, ''whether the evidence will support the implied finding of the jury that the condition complained of had existed for a sufficient length of time to constitute constructive notice and also whether a reasonable time to remedy the condition had existed.'' It does not dispute that the sunken spot was dangerous at the time of the accident, but contends that ''there is no evidence as to how long the condition complained of existed'' prior thereto, and that this question was left to surmise.

Respondent relies wholly on constructive notice, for her counsel admit that ''there is no evidence that there was actual notice'' of the dangerous condition.

We agree with appellant that a city is not an insurer of the safety of travelers (*George* v. *City of Los Angeles,* 11 Cal.2d 303, 308 [79 P.2d 723]) ; that the Public Liability Act is to be strictly construed against the claim (*Whiting* v. *City of National City,* 9 Cal.2d 163, 165 [69 P.2d 990]) ; that all the requirements conditioning the city's liability must be supplied (*Nicholson* v. *City of Los Angeles,* 5 Cal.2d 361, 363 [54 P.2d 725]) and that the res ipsa loquitur rule does not apply.

There was no evidence (as in some cases) of any prior accident, or of any complaint or report of a dangerous situation having been turned in.

Despite all these considerations we are convinced that there was substantial evidence to sustain this verdict against the city.

In *Fackrell* v. *City of San Diego,* 26 Cal.2d 196, 206-7 [157 P.2d 625, 158 A.L.R. 625], the court says: ''The rules governing constructive notice require reasonable diligence in making inspections for the discovery of unsafe or defective conditions . . . As to what constitutes a dangerous or defective condition no hard-and-fast rule can be laid down, but each case must depend upon its own facts [citations]. Whether a given set of circumstances creates a dangerous or defective condition is primarily a question of fact [citations].

The findings of the trial court must be sustained if they are supported by substantial evidence. All legitimate and reasonable inferences must be indulged toward upholding the findings. Appellate courts, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical. (*Estate of Bristol* (1943), 23 Cal.2d 221, 223 [143 P.2d 689].)''

In *Laurenzi* v. *Vranizan,* 25 Cal.2d 806, 812 [155 P.2d 633], the court, quoting *Nicholson* v. *City of Los Angeles,* 5 Cal.2d 361, 364-5 [54 P.2d 725], says that '' 'there must be shown, in order to charge the city with constructive notice . . . some element of conspicuousness or notoriety so as to put the city authorities upon inquiry as to the existence of the defect or condition and its dangerous character. It is equally clear, we think, that where the city is charged with constructive notice on the basis of a duty to inspect, it must be made to appear that a reasonable inspection would have disclosed the defect or dangerous condition; that is, that had there been no neglect of duty there would have been actual notice on the part of the city officers.' ''

*Perry* v. *City of San Diego,* 80 Cal.App.2d 166, 170 [181 P.2d 98], follows *Laurenzi* v. *Vranizan, supra,* and quotes from *Kirack* v. *City of Eureka,* 69 Cal.App.2d 134 [158 P.2d 270] as follows: '' 'The rule is well established that constructive as well as actual knowledge of a dangerously defective sidewalk or street may render a municipality liable for damages for injuries sustained on that account when such defects should be reasonably anticipated by the officers in charge, or when reasonable inspection would have disclosed the dangerous condition.' ''

Numerous cases hold that ''it is a question of fact . . . whether the dangerous condition . . . had existed for a sufficient length of time to constitute constructive notice and also whether a reasonable time to remedy the condition had existed.'' (*Wise* v. *City of Los Angeles,* 9 Cal.App.2d 364, 366 [49 P.2d 1122, 50 P.2d 1079].) In the latter case it was held that the existence of a defect for four or five days was substantial evidence to sustain a finding of constructive notice.

The factors of constructive notice and adequacy of inspection both enter into this case, and in discussing them the

effect which the photographs of the crossing might have had on the jury cannot for a moment be discounted. ■ The fairness of the photographs is not questioned, and their value was for the jury to determine (10 Cal.Jur. p. 896.)

Respondent contends that the photographic evidence, by itself, portrays a situation conspicuously dangerous, from which the jury must have concluded that it had existed for a considerable time.

Eight photographs were in evidence. Six of them (taken four days after the accident) were plaintiff's exhibits, and two (taken about two months later) were defendants'.

The best view of the crossing as a whole is found in one of defendants' exhibits. In addition to the spot in question it shows between the slot and the easterly rail and well within the pedestrian lane, a depression much longer—probably 4 feet in length—than the one in question, and much deeper. Within this sunken area it shows 18 or more paving stones of varying sizes and shapes—no two alike—laid unevenly and roughly, and not firmly embedded like others shown. Lying beside these, and between the slot and the westerly rail, there are about ten paving stones, irregular, uneven and unmatched, and a large slab of some kind. It shows a concrete patch outside the easterly rail leading up, apron-fashion, from the surface of the street to the top of the rail, obviously to bridge a difference in elevation between the surface of the street and the rail. It shows to the south of the pedestrian lane two hatch-covers of low grade lumber, one of irregular shape, split and containing a large knot, and the other likewise split. Adjoining them to the south is a large, gaping hole from which the hatch-cover is either missing or sunken out of sight. Next beyond, on the southerly side, the paving stones on each side of the slot are sunken, rough, unmatched, and unevenly laid. The same photograph shows the southbound track as well, with still another sunken area deeper than the one in question, perhaps 4 feet long, lying partly within and partly without the pedestrian lane, the wooden hatch-covers whereof are not uniform but rough, uneven and unmatched.

We have stated what this one photograph shows, and it probably gave the jury a very bad impression. Several close-ups of the spot in question show in detail the coarse-grained wood of the hatch-covers, the large knot in the split chunk, also the irregular way in which they are laid. Other photographs show the sunken and irregular spots from different viewpoints.

The over-all picture presented by these eight photographs, singly and in combination, was that of four distinct sunken and irregular areas in the surface of the street, three of them unquestionably worse than that which caught respondent's shoe.

We appreciate that the issue before the jury was whether the precise spot wherein respondent tripped, was dangerous. The city does not claim that it was not, and the uncontradicted evidence shows that it was 3 to 3½ inches deep. But in considering the questions whether it was *conspicuous* or *notorious,* and *whether it had existed for a long time* the jury could also consider the three other sunken areas surrounding it, all of which were worse. Ordinarily the only dangerous spot before a court is the one which does the damage.

In "searching the record and exploring the inferences which may arise from what is found there" (Fackrell case, *supra*) a reviewing court studying these photographs— or even glancing at them for that matter—cannot help concluding that they warranted the jury in finding not only that the spot in question was conspicuously dangerous, but that, because of the appearance of the paving stones and hatchcovers, and their relation to the rails and slots, all four areas had been settled and sunken for a considerable time, resulting in a general, chronic condition of disrepair and not one which, in the nature of things, could have arisen suddenly.

In *Sebern* v. *City of Riverside,* 42 Cal.App.2d 701 [109 P.2d 747], the photographs in evidence were alone held to justify the inference that "an extremely dangerous hazard for pedestrians" existed. The court there said: "The photographs in evidence disclose such a conspicuously dangerous situation that the court would be justified in finding that the city had constructive notice under the rules discussed in *Nicholson* v. *Los Angeles,* 5 Cal.2d 361 [54 P.2d 725]."

Counsel for respondent argue here (as they undoubtedly did to the jury) that the photographs also demonstrate that when the crosswalk was painted on June 30, 1948, the depression must have been there because (they argue) in the pictures taken four days after the accident white paint is to be detected beneath the rail, which would be there only if the surface had already sunk. This question was solely for the jury to decide.

When the jurors came to consider the important question whether "a reasonable inspection would have disclosed the

720

defect or dangerous condition'' (Laurenzi and Nicholson cases, *supra*) they likewise had the photographs before them.

The only testimony respecting inspection was given by two employees of the city, both called by the plaintiff. The city called no witness on this or any other subject.

The witness Lang, an assistant traffic engineer, had charge of the paint crews whose job it was to put the white signs and markings on the streets. The pedestrian lanes are painted (with a spray-gun) about every six months, and the witness testified from records that this crosswalk was painted on June 30, 1948, 26 days before the accident. He testified that it is not the duty of his inspectors, who take care of painted lines, to inspect for defects in streets, but he could not answer whether they had to report such defects in case they discovered them. He testified that his own department was ''traffic-conscious''; that anyone out on the job would report any broken pavement as a matter of custom and office policy.

The witness Hiden (called by plaintiff) testified that he had six assistants whose duties include inspections for defects or hazards in sidewalks and streets. He testified that nothing connected with this intersection had been brought to his visual notice. At the time of the accident two men were inspecting on foot in the Mission district and one in the Richmond, and two other inspectors used automobiles. When asked if anybody was inspecting the downtown district he answered ''The down town district had been inspected in 1947.'' ''Q. And you ignored that district in the matter of any routine inspections of conditions of the streets since 1947, is that correct? A. We have one inspector who takes care of any defects which are reported or complaints that are made . . . Q. So far as your recollection of the physical performance of the inspection that would have covered the intersection of Golden Gate Avenue and Jones Street, nothing has been done in that area since 1947? A. That is my opinion, yes sir.

''The Court: Q. What part of 1947? A. Up to about November of 1947.

''Q. Do you mean inspections had been made in 1947? A. Yes, sir, they had, and we began again in the latter part of 1948 down there.

''Q. What part of 1948? A. Started in September of 1948.''

None of the crew who painted the crosswalk 26 days before the accident was called by the city to show its condition as they had then found it. None of the witness Hiden's inspectors

was called, and the last testimony (except medical) that the jury heard was the latter's admission that there had been no inspection of the downtown area between November, 1947, and the time of the accident. This testimony was only with respect to the downtown area in general, and not with respect to this intersection or even the neighborhood surrounding it. Approximately eight months, then, had gone by just before the accident without any inspection, and apparently 10 months elapsed (November to September) between inspections.

We are satisfied that the verdict is supported by substantial evidence and that the court properly denied the motions for judgment notwithstanding the verdict and for new trial.

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.