[Civ. No. 20739. Second Dist., Div. Three. Oct. 17, 1955.]

ESTHER G. HOEL et al., Appellants, v. CITY OF LOS ANGELES, Respondent.

Paul Gordon and Joseph A. Capalbo for Appellants.

Roger Arnebergh, City Attorney, Bourke Jones, Assistant City Attorney, Joseph N. Owen and Weldon L. Weber, Deputy City Attorneys, for Respondent.

ASHBURN, J. pro tem.*—Plaintiffs appeal from an order granting a new trial in a jury case in which they secured a verdict for $10,000. The action is one for wrongful death of Arup C. Hoel, brought by his heirs under the Public Liability Act of 1923, now codified in Government Code, sections 53050 and 53051.

The order granting the defendant's motion for new trial does not specify insufficiency of the evidence to justify the verdict as a ground upon which granted, nor does it specify any other ground. It is therefore conclusively presumed that the order was not based on insufficiency of the evidence (Code Civ. Proc., § 657, subd. 7) and the appellate court is precluded from examining into that question but has the duty "to consider the entire record upon which the order was based to discover whether there is any error which would have justified the trial court in making the order, and if so the order will be sustained although the grounds urged on the motion (with the exception of the ground of insufficiency of the evidence) were not specified in the order." (*Ballard* v. *Pacific Greyhound Lines,* 28 Cal.2d 357, 361 [170 P.2d 465].)

Such an examination discloses that there were at least three errors which justify the granting of the motion, (1) denial of motion to strike testimony of Captain Louis J. Fuller of the Los Angeles Police Department, (2) overruling of objection to proffered portion of investigating police officers' accident report and (3) modification of an instruction requested by defendant.

The accident occurred on Sunday, May 4, 1952, about 7:40 a. m., at the intersection of Washington Boulevard and Griffith Street. Washington runs east and west and Griffith

---

*Assigned by Chairman of Judicial Council.

north and south. At this intersection were four automatic traffic signals, one on each corner; they were Acme type, having white and red semaphore arms for "go" and "stop," and green and red lights operating with the arms, green for "go" and red for "stop." Mr. Hoel was driving a Pontiac sedan easterly on Washington and arrived at the intersection when the traffic signal was open or "go" for him. At the same time James Williams was driving a Buick automobile northerly on Griffith Street; the signal on the southeast corner governed his movement; the white or go arm was displayed and the red light was on; Mr. Williams, seeing the white arm and not noticing the red light, went into the intersection, collided with the Hoel car, which swerved, hit a westbound automobile driven by one Yaeger, and turned over on Mr. Hoel, inflicting injuries which caused his death. The arm motor of the signal on the southeast corner was out of order and the white arm was stuck outside the housing box, giving the go signal to all traffic, while the red arm was stuck inside the housing.

Section 53050, Government Code, defines "public property" as meaning public street, highway, building, park, grounds, works, "or property"; and "local agency" as including a city. Section 53051 provides: "A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition:

"(a) Had knowledge or notice of the defective or dangerous condition.

"(b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition." [3] It is now settled law that automatic traffic signals are included in the term property as used in the statute. (*Bady* v. *Detwiler*, 127 Cal.App.2d 321, 330 [273 P.2d 941].)

The trial of this case revolved principally around the phrase of section 53051, "or person authorized to remedy the condition," and specifically the question whether a police officer comes within that category. Plaintiffs' theory was that James Taylor Allen, who was a motor officer in the Traffic Enforcement Division of the Los Angeles Police Department, his motor number being 203-M, observed the defective condition of the traffic signal and reported it to the "Mike Room" or Communications Division of the Police Department at

7:23 a. m.; that the information was relayed to the Department of Traffic, in charge of maintenance of such signals, at 7:26 a. m.; Albert Dahl, a field man, was assigned over the air to correct the situation at 7:28 a. m.; he was then at Jefferson and Vermont Streets, and arrived at the Washington-Griffith intersection at 7:43 a. m., after the accident had happened; that there would have been no such occurrence if Officer Allen had performed his duty of correcting the condition of the signal immediately upon discovery of the dangerous situation created by the existing defect therein.

To establish this alleged dereliction on his part, plaintiffs' counsel called under section 2055, Code of Civil Procedure, Captain Louis J. Fuller, head of the Traffic Division of the Police Department. Asked what instructions are given to police officers concerning discovery of defective traffic signals, he testified that the officer should notify the communications division, giving location of the signal, "and he should turn it off, and he should direct traffic if the conditions warrant it." Also that the officer's patrol box key generally fits most types of traffic signal control boxes, though some of the Acme signals require a special key; that the officer should exercise his own judgment and discretion as to directing traffic. Asked what should be done if the semaphore is up and he has no key, the witness said: "A. Yes, if a signal is defective and exhibiting conflicting instructions to the driving public, he should do everything possible to remove the particular signal by pulling the arms down, or in the case of lights, they are to be covered up by newspapers or anything that he can get to effect a covering of the signal. In other words, he is supposed to put the signal out of operation if there is a possibility that the congestion or the conditions which exist are dangerous." Counsel for defendant then moved to strike the testimony upon "the ground it is incompetent, irrelevant and immaterial and does not tend to prove any issue in this case, in that a failure of an employee, including a policeman, to do a duty is not a responsibility or liability of the City, itself. It is hornbook law that failure of employees of the City to do their duties, or otherwise, if they commit a tort, does not render the City liable in the absence of a statutory enactment to that effect." This motion was made in the presence of the jury. Court and counsel then retired to chambers and after considerable discussion the motion was denied; the judge then informed the jury "that the motion to strike the Captain's testimony has been denied." Thereupon counsel

for the city recalled the witness and introduced in evidence a daily training bulletin which the captain said he had handed counsel, and which provides, in part, under the caption "How to Direct Traffic": "However, at congested intersections it is often necessary to assume emergency control pending arrival of a 'TSR' car.

" 'Methods of control: It is often dangerous to attempt to direct traffic in opposition to a defective signal. Motorists may become confused by conflicting directions of the mechanic signal and those given by the officer, and may cause an accident or further congestion.

" 'When an officer observes a defective signal which is causing congestion, he should notify the Complaint Board of the situation and turn off or cover the signals. The officer can then direct traffic with less danger than when the signal and the officer are in conflict.' " . . .

" 'Semaphore: The older Acme or semaphore and two-light type signal controller boxes can usually be opened with an ordinary field telephone key. To turn off the signal, the switch marked "Fold" should be depressed until the semaphore arms are recessed and then the lower dial turned to the "Off" position. If the arms do not fold, they can be pulled down manually after the dial has been set at "Off."

" 'Where only the semaphore arms are faulty, and it is desired to continue use of the signal lights, the arms may be recessed by depressing the "Fold" switch, and turning the upper control knob from "Arms-lights" to "Lights." This will prevent shutting off the entire signal as would be done with the lower dial. The normal traffic cycle can be continued and controlled by the lights only.

" 'Covering defective signals: In the event that no key to the control box is available, some signals may be covered with jackets, newspapers, sacks, or any other available materials.' " The witness also said that his former testimony referred to this training bulletin and that the officers have no authority to go into the boxes to do anything to them, that they are instructed not to do so, that they are not allowed to change the timing device or in any way interfere with the operation of the signals. He also explained that he meant the officers could not open the box for purpose of adjusting or changing the operation, but that they had authority and were instructed to open the box and turn the signal off entirely. He also said he thought Allen's working hours were 6 p. m. to 2 a. m. and that an officer who has extended beyond his

normal tour of duty would be required to take the action that is indicated in the bulletin. (Officer Allen had previously testified that his tour had ended at 2 a. m. but he had actually worked until 7 a. m. that morning; later he said that at 7 he phoned the station, gave his number and reported that he had completed his watch.)

The court's announcement to the jury that the motion to strike the Fuller testimony had been denied meant, of course, a rejection of counsel's claim "that a failure of an employee, including a policeman, to do a duty is not a responsibility or liability of the City, itself." The matter next arose upon motion for nonsuit which was handled outside the presence of the jurors. The judge at that time said: "The Court does not construe the language 'a person authorized to remedy the condition' to include a police officer." He also said during this discussion: "The evidence is in as to the duty of the police officer, but it should not be commented on if this case goes to the jury as predicating liability upon the part of the City because he neglected to do his duty. The evidence of the notification inferentially by this officer to the traffic Communications Center, bears upon the question of reasonable time within which to remedy." And the court instructed counsel not to argue to the jury that "the police officer was a person authorized to remedy the condition." But, during the jury argument Mr. Owen, counsel for defendant, adverted to the matter and the following occurred:

"Now, the mere fact that he didn't do all the things that counsel tells you Lieutenant Fuller said he should have done would not make the City responsible for the condition existing there, because Officer Fuller told you himself that the man had no authority whatsoever to touch that traffic signal, go inside and repair it, do anything to it.

"Mr. Gordon: Excuse me.

"The Court: Yes, I believe we are impinging upon an area which we should not enter.

"Mr. Gordon: The statement is contrary to the evidence, as well, your Honor, and if counsel comments on it, I am going to ask the Court for the privilege to similarly comment on it.

"Mr. Owen: Well, I will pass it up, knowing what Captain Fuller's testimony was.

"Mr. Gordon: May I ask the Court that the jury be instructed to disregard it, because the statement made by counsel

is contrary to the duty and authority of the officer. He said he had no authority to go into the box and do anything.

"THE COURT: He said he had no authority to go into the signal box. The jury is instructed that it is to disregard entirely as though you had never known of it, the statement of counsel just made, by Mr. Owen." The Fuller evidence was still in the record, as the jurors had been told, but counsel were forbidden to discuss it in their arguments. This was due to the court's view, expressed to counsel but not the jury, that the only pertinence of Officer Allen's alleged conduct was as an aid in determining whether more than a reasonable time had elapsed between his reporting the defective signal and the actual doing of the work of correction.

The transcript, read in the light of the instructions, indicates that this was the question which the judge intended to submit to the jurors, but it does not show directly or inferentially that they ever realized the fact. For, after several hours of deliberating, they returned into court and asked to have Captain Fuller's testimony read to them. That was done; the testimony was read in its entirety, including the daily training bulletin, and the foreman said: "I believe that will be sufficient." After several more hours of deliberation a 9 to 3 verdict was rendered. No explanation of the place which the Fuller testimony occupied in the case was given the jurors and the conclusion seems almost inevitable that the verdict was based upon a finding that Officer Allen was remiss either in failing to direct traffic or failing to depress and recess the faulty and misleading signal arm.

If it was the former, failure to direct traffic, it was clearly a theory not sanctioned by the law. Such nonfeasance would be within the exercise of a governmental function and could give rise to no municipal liability because not consisting of the use of defective property. (See *Stang* v. *City of Mill Valley*, 38 Cal.2d 486, 488 [240 P.2d 980]; *Douglass* v. *City of Los Angeles*, 5 Cal.2d 123, 127-128 [53 P.2d 353]; *Bauman* v. *City & County of San Francisco*, 42 Cal.App.2d 144, 158 [108 P.2d 989].)

If the jurors proceeded upon the latter theory (as they were impliedly authorized to do, by the manner in which the Fuller testimony was handled) they were again misled. This conclusion flows from a careful and necessary analysis of the statute and the judicial precedents. In the first place, the statute is in derogation of the common law rule of no liability for malperformance of a governmental function

and is to be strictly construed. (*Whiting* v. *City of National City*, 9 Cal.2d 163, 165 [69 P.2d 990]; *Allen* v. *City of Los Angeles*, 43 Cal.App.2d 65, 68 [110 P.2d 75]; *Dineen* v. *City & County of San Francisco*, 38 Cal.App.2d 486, 494 [101 P.2d 736]; *Van Dorn* v. *City & County of San Francisco*, 103 Cal. App.2d 714, 716 [230 P.2d 393].) The statute itself draws a distinction between remedying and affording protection against an existing defect. The knowledge or notice must reach a body, board or person authorized to remedy the condition, and that body or person must within a reasonable time "remedy the condition or . . . take action reasonably necessary to protect the public against the condition." In other words, make a permanent correction or supply temporary protection against an uncorrected defect. But this idea of temporary action does not enter into the definition of the person who must have notice or knowledge. He must be one who is authorized to remedy the defect, not merely to temporarily safguard against it. Funk & Wagnall's New Standard Dictionary gives this definition of remedy, among others: "To restore to a normal or sound condition; make right; repair. . . ." And Webster's New International Dictionary: "To provide or serve as a remedy for; to cure; relieve; correct; repair. . . ." Permanence is the central idea of the word remedy and it is reflected in the contrasting phrases of section 53051. Under the evidence heretofore discussed a police officer not only has no authority to do more than afford temporary protection against a known defect in the signal but he is instructed to do no more than that. It also appeared from ordinances received in evidence that the Board of Traffic Engineering Commissioners was empowered "To maintain and repair traffic control equipment" and that "No other officer, board or department of this City, and no private agency or person, shall install, place or maintain any traffic control device within the purview of this chapter except upon the order of the Commissioners." And "maintain" implies repair and upkeep (54 C.J.S., p. 904; see *Holman* v. *County of Santa Cruz*, 91 Cal.App.2d 502, 519 [205 P.2d 767]). The police are excluded from such activities. The authorities are not opposed to the views just expressed.

*Sinclair* v. *City of Pasadena*, 21 Cal.App.2d 720, 722 [70 P.2d 241], holds that notice to a mere employee of the city is not enough and says: "The word 'person,' in the statute hereinabove quoted, obviously is limited in its meaning to an officer or member of a governing board. It cannot, under

any rule of construction, be meant to include employees generally.'' The foreman of a crew that negligently created the dangerous condition was held not to be a "person authorized to remedy" within the purview of the statute. While this case appears not to have been overruled or criticized, later decisions have broadened the application of the statute. Appellants cite in this connection *Ervin* v. *City of Los Angeles*, 117 Cal.App.2d 303 [256 P.2d 25] ; *Bauman* v. *City & County of San Francisco*, 42 Cal.App.2d 144 [108 P.2d 989] ; *Hook* v. *City of Sacramento*, 118 Cal.App. 547 [5 P.2d 643]. It appears that in each instance, except Ervin, the person held to have the necessary authority was one who was in position to put a stop to a dangerous condition, not merely to build a fence around it.

The Ervin case is not in point, for it deals with the matter of notice received through an employee charged with the duty of relaying his information to those having authority to correct, not with his status as one having such authority; it also deals with a showing of constructive notice through lapse of time.

In the Bauman case directors who were placed in charge of a playground by the city's recreation commission were held to have authority within the statute; the dangerous condition was due to the playing of hard baseball, which they had authority to stop (p. 157). Hook dealt with an apron or incline from sidewalk to street, which had a dangerous hole in it. It was held that the foreman of maintenance of streets, whose duty it was to inspect and maintain the streets, had authority to remedy, put an end, to the dangerous hole. Other cases reflect the same concept of remedy—permanent correction.

In *Huff* v. *Compton City Grammar School Dist.*, 92 Cal. App. 44, 47-48 [267 P. 918], the district superintendent of a school district was held to have authority to remedy a dangerous incinerator upon the school ground. In *Wise* v. *City of Los Angeles*, 9 Cal.App.2d 364, 367-368 [49 P.2d 1122, 50 P.2d 1079], a surveyor who dug a hole in a city street was held to be a person authorized to close and remedy it. *Dawson* v. *Tulare Union High School*, 98 Cal.App. 138, 142 [276 P. 424], held that the principal of a school had authority to remedy the dangerous condition created by a piano which rested on a dolly and was moved about in the school—remedy by putting an end to the situation. *Johnson* v. *County of Fresno*, 67 Cal.App.2d 116, 122 [153 P.2d 557] : A bridge was out and

the warning signs were down. The road foreman was in charge and held to be a person authorized to remedy. Throughout all these cases runs the fact that the person held authorized to remedy could and normally would correct the situation by putting an end to it, not using some temporary expedient designed to avert accidents until someone should arrive with authority and capacity to make the needed restoration of a safe condition.

The Traffic Service Repair Unit had authority to remedy the condition or to take action reasonably necessary to protect the public against it. The latter, of course, could have been accomplished by temporary measures, such as by pulling down the arms or covering them. If Allen had notified the Repair Unit it could have been argued, with good reason, that the Repair Unit had an opportunity to take immediate action by instructing Allen to put the arms out of commission. But Allen did not notify the Repair Unit, and not being one who had authority to "remedy" the condition, his failure to take temporary measures to guard the public against it was not the failure of the Repair Unit or the city. The jury's finding of liability could have been upon the ground that the repair unit failed in its duty to remedy the condition or guard the public against it or upon the ground that Allen had that same duty as one who had authority to remedy the condition. Authority to take temporary measures to guard against a dangerous or defective condition in an emergency might be attributed to many servants of the city who had not authority to remedy the condition by removing it. But notice to such persons is not the notice which the statute prescribes as a prerequisite of a duty to act. The trial judge correctly concluded that a city policeman, having the authority and duty described in the testimony and the bulletin produced by Captain Fuller, does not have "authority to remedy" within the meaning of the statute. And the Fuller testimony should have been stricken.

The theory that testimony concerning Officer Allen would be material to the question of whether more than a reasonable time elapsed between his report and the making of repairs, does not justify the refusal to strike the Fuller testimony. He did not talk about what Allen did, only what he should have done, and the theory called for only the fact of Allen's giving notice to the proper agency, if he did so, a question which will be discussed later.

The trial judge doubtless decided that the ruling on the motion to strike was erroneous, that the Fuller testimony was handled (unintentionally but actually) in such way as to mislead the jury and that substantial prejudice had been suffered by defendant. Hence the granting of a new trial was clearly justified.

Counsel for appellants argue that respondent lost its right to have the Fuller evidence stricken because counsel did not initially object to the questions that elicited the objectionable matter. ■ Ordinarily such a failure does effect a waiver of any right to complain. But the motion was fully argued on its merits, it went to the heart of plaintiffs' case, and the situation was one that called for the court to take action on his own motion because necessary in furtherance of justice. ■ "The trial judge is not a mere umpire. On the contrary he is under a duty to see that a fair trial is accorded the parties on the merits which means excluding on his own motion matters that tend only to prejudice the jurors and take them away from a consideration of the case upon its merits and its merits alone." (*Dastagir* v. *Dastagir*, 109 Cal. App.2d 809, 816 [241 P.2d 656].) See also, to the same effect, *Miller* v. *Republic Grocery, Inc.*, 110 Cal.App.2d 187, 192 [242 P.2d 396]; *Trancoso* v. *Trancoso*, 96 Cal.App.2d 797, 798 [216 P.2d 172]. The court should have exercised this supervisory power in this instance, and when he concluded on motion for new trial that he should have done so, the granting of the motion was eminently proper. **[11]** Even if the moving party was technically estopped to claim error, that fact would not impair the power of the court to do justice by granting the new trial (see *Nieves* v. *Vigolino*, 135 Cal.App. 763 [27 P.2d 916]; *Conroy* v. *Perez*, 64 Cal. App.2d 217, 226 [148 P.2d 680]).

■ *Sloboden* v. *Time Oil Co.*, 131 Cal.App.2d 557, 558 [281 P.2d 85]: "The proper rule, supported by many cases, is stated as follows in 4 Cal.Jur.2d page 476, section 598:

" 'The granting or denial of a new trial is a matter resting so largely in the discretion of a trial court that it will not be disturbed except upon a manifest and unmistakable abuse. This is especially so when the discretion is used in awarding a new trial, for this action does not finally dispose of the matter, and it is only in rare instances and on very strong grounds that the reviewing court will set aside such an order. . . .

" '. . . But so long as a reasonable or even fairly debatable justification under the law is shown for the action taken, that action will not be set aside, even if, as a question of first impression, the appellate court might feel inclined to take a different view."

We have discussed the case thus far as if there were competent proof that Officer Allen reported the defect in the signal at 7:23 a. m. and then did nothing more about it. The assumption rests, however, upon incompetent evidence received over pertinent objections of defendant's counsel. It was established that the mike room informed the department of traffic at 7:26 a. m. that at this intersection "southeast arm motor [in] bad order." This information must have come to the mike room by radio telephone and such means of communication was available "only to the Police Department or the Traffic Service Repair Unit, or an ambulance, or in some limited cases to the Federal Bureau of Investigation." From one of those sources the information must have come, but it does not appear from which one unless the effort to identify Officer Allen as the informant was successful. He testified that he was off duty at 7 a. m., and then started for home; although a convenient route would be east on Washington, across Griffith and on to the east, he further said that he did not recall using Washington Boulevard or crossing the Washington-Griffith intersection on that occasion, or indeed what route he took to his home; that he did not recall reporting this signal out of order. He belonged to the traffic enforcement division, was a motor officer, his motor number 203-M, and if he made a report would do so over the air, his motorcycle being equipped with radio. This left plaintiffs far short of a showing that Officer Allen or any other policeman had observed and reported the defective signal. And the records of the mike room had been destroyed before the trial in ordinary course of business. So plaintiffs' counsel resorted to the accident report of the investigating officers who arrived at the scene after the accident and while Dahl (deceased at time of trial) was making his repairs; their report was made as a result of their investigation at the scene. It contains the matter which was received over objection of defendant. " 'The Mike Room received a call from Motor Unit 203-M at 7:23 a. m., regarding condition of this signal, which in turn relayed information to TSR Unit.' " The source of this information does not appear. It could not have been within the personal knowledge of the

investigating officers; objection was made on the ground, among others, that it was hearsay. Counsel for plaintiffs admitted it was hearsay but claimed it was nevertheless admissible. They asserted it was admissible as an official record under section 1920, Code of Civil Procedure,[1] and they now argue that it was also receivable under section 1953f, Code of Civil Procedure,[2] as a business record.

Another claim, that it was competent under section 1937, Code of Civil Procedure, may be summarily disposed of. That section provides that after proof of loss of a document "its contents may be proved by a copy, or by a recital of its contents in some authentic document. . . ." This accident report does not fit this language. We have examined the original exhibit and it does not purport to be a recital of the contents of the mike room record, as contended by counsel.

Not all official reports and not all business records are made competent by the cited sections of the code. ▇▇▇ Essentially accident reports, especially those compiled by police at the scene of an accident—based on statements of participants, bystanders, measurements, deductions and conclusions of their own—fail to qualify as admissible official records or business records. (See *Needle* v. *New York Rys. Corp.*, 227 App.Div. 276 [237 N.Y.S. 547, 549]; *Johnson* v. *Lutz*, 253 N.Y. 124 [170 N.E. 517, 518].) That accident reports are not admissible under statutes such as our Uniform Business Records as Evidence Act (Code Civ. Proc., §§ 1953e-1953h) was held in *Palmer* v. *Hoffman*, 318 U.S. 109 [63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719]. [14] In *McGowan* v. *City of Los Angeles*, 100 Cal.App.2d 386, 392 [223 P.2d 862, 21 A.L.R.2d 1206], this court said: "The statute does not change the rules of competency or relevancy with respect to recorded facts. It does not make that proof which is not proof. It merely provides a method of proof of an *admissible* 'act, condition or event.' It does not make the record admis-

---

[1] "§ 1920. . . . Entries in public or other official books or records, made in the performance of his duty by a public officer of this state, or by another person in the performance of a duty specially enjoined by law, are prima facie evidence of the facts stated therein."

[2] "§ 1953f. . . . A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, or at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

sible when oral testimony of the same facts would be inadmissible." This language was repeated in *Reisman* v. *Los Angeles City Sch. Dist.*, 123 Cal.App.2d 493, 506 [267 P.2d 36], in holding that certain reports prepared by public officials were inadmissible under section 1953f; and this was followed by application of the same principle to so-called public records. "As above shown, the report herein contained numerous opinions, arguments, and statements of purported facts which would not have been admissible as oral testimony. There was no official duty on the part of the board to make entries of such a report in official books or records. The statements in the McGowan case, above quoted, are applicable here. It was error to receive the report in evidence under said sections 1920 or 1926." The extract from the report which was received at bar was essentially hearsay, as counsel for both sides asserted; it was not admissible under the suggested exceptions to the hearsay rule, and the ruling receiving it in evidence was grievous error, which alone justified the granting of the new trial.

Because the attorney for defendant introduced the rest of the police report after this point had been ruled against him counsel for appellants say the error in receiving the extract was waived. Such is not the law. ■ An attorney who submits to the authority of an erroneous adverse ruling, after making appropriate objections, does not waive the error in the ruling by introducing responsive evidence to offset or explain the erroneously admitted evidence so far as possible. He is entitled to make the best of a bad situation, not of his own creation. There is no element of waiver or estoppel in such conduct of counsel. In effect this is the holding in *Story* v. *Green*, 164 Cal. 768, 772 [130 P. 870, Ann.Cas. 1914B 961]. *De Roulet* v. *Mitchel*, 70 Cal.App.2d 120, 125 [160 P.2d 574], says: "But because appellant contended at the trial that such issue was immaterial to a decision of the case she was not thereby inhibited from meeting the proof introduced by her adversary. Neither is she estopped from urging the error on appeal. It is the duty of any litigant in the course of trial to submit to the rulings with reference to the proof of the issues, and after he has done so he may thereafter on appeal demonstrate the error of the ruling to which he made timely objection." Volume 3, Witkin's California Procedure, section 92(c), page 2258, says: "No estoppel results from acts which are defensive or precautionary. Thus, where the appellant offers instructions on an irrelevant

matter only after an unsuccessful attempt to remove it from the case, he may attack its relevancy on appeal. (*Williamson* v. *Pacific Greyhound Lines* (1949), 93 Cal.App.2d 484, 487 [209 P.2d 146].)'' In section 93(c) at page 2260: ''*Defensive Action*. If the appellant makes his objection to what he deems defective pleading, inadmissible evidence, or erroneous instructions, and is unsuccessful, it is hardly safe for him to stand firm, risking everything on the objection. Usually he will proceed, despite the error, to meet the opposing case on the merits. This necessary precaution on his part does not indicate acquiescence in the ruling and does not result in a waiver of the error.

''Thus, if evidence is offered outside the issues, the appellant, after his objection is overruled, may offer rebuttal on the issue without waiving the objection. (*Fernandez* v. *Western Fuse etc. Co.* (1917), 34 Cal.App. 420, 423 [167 P. 900]; *De Roulet* v. *Mitchel* (1945), 70 Cal.App.2d 120, 125 [160 P.2d 574].) Nor does a waiver result from cross-examination of the respondent on inadmissible matter after objection thereto has been overruled. 'Were it otherwise, one of the main functions of cross-examination would be most seriously impaired; for a party, after rightfully objecting to the admission of evidence, may by his cross-examination lay the foundation for an obviously proper motion to strike it out, or may compel its contradiction or withdrawal, or may utterly destroy its effect, and thus render unnecessary his remedy by appeal from the court's erroneous action.' (*Jameson* v. *Tully* (1918), 178 Cal. 380, 384 [173 P. 577]; see also *Moore* v. *Norwood* (1940), 41 Cal.App.2d 359, 368 [106 P.2d 939].)''

Defendant requested an instruction (number 8) on the subject of actual notice of a dangerous condition. The court modified and gave it in the form now set forth. Matter which is underlined and stricken represents changes made by the judge. ''Where one relies upon actual notice as charging a municipality with knowledge of a dangerous or defective condition, that notice must be given to the governing or managing board or other department, officer or person having authority to remedy such condition, or must be communicated to a responsible agent or employee charged with the duty, when himself informed of such dangerous or defective condition, to communicate such information to a board, officer or person having authority to remedy such condition. Notice to any *other officer or* employee of a municipality is not sufficient to fulfill that requirement unless he, in turn, actually

communicates such information to a responsible person charged with, or having authority to, remedy such condition *or is himself a person authorized to remedy such condition.* The burden of proving such actual notice ~~having been communicated to a board, officer, or other responsible person charged with, or having the duty to make such repairs,~~ is upon the plaintiff. ~~when relying upon actual notice.~~'' In short it said, when submitted, that actual notice must be given to one having authority to remedy or to an employee charged with the duty of communicating same to a person having authority to remedy, and that notice to any other employee (not charged with such duty) does not count unless actually passed on to the person in authority. This is sound, and favorable to plaintiffs' cause. When the court inserted the phrase ''or is himself a person authorized to remedy such condition'' it took the life and meaning out of that sentence, and pointed the finger at Officer Allen, with the inevitable result of confusing or misleading the jury. Another error supporting the order granting a new trial. ''On an appeal from an order granting a new trial the action of the trial court will not be disturbed if upon any hypothesis it can be sustained. Its action is conclusive upon this court, unless an abuse of discretion is made to appear.'' (*Biaggi* v. *Ramont*, 189 Cal. 675, 681, 682 [209 P. 892].)

The order granting a new trial is affirmed.

Shinn, P. J., concurred. Vallée, J., concurred in the judgment.

A petition for a rehearing was denied November 7, 1955, and appellants' petition for a hearing by the Supreme Court was denied December 14, 1955.