[Civ. No. 24050. Second Dist., Div. Two. Feb. 23, 1960.]

ELVA M. PRITCHARD, Respondent, v. SULLY-MILLER CONTRACTING COMPANY (a Corporation) et al., Defendants; CITY OF LONG BEACH, Appellant.

Walhfred Jacobson, City Attorney, and Leonard Putnam, Deputy City Attorney, for Appellant.

Stratton, Taylor & Battin and David H. Battin for Respondent.

ASHBURN, J.—On January 2, 1957, plaintiff was riding in an automobile driven by her husband, westbound on Pacific Coast Highway which is a state highway partially located within the city of Long Beach. At the intersection of Redondo Avenue with said highway plaintiff's husband, while his signal was green, turned left, or south, and when the signal was red for westbound traffic drove into the eastbound lane which then had a green light for eastbound traffic; there was an eight-second lag between the red light for the westbound traffic and the red light for the eastbound traffic. Defendant Montgomery, driving a truck of his employer-defendant, Sully-Miller Contracting Company, approached from the west and as the green light was with him entered the intersection. Mr. Pritchard and Mr. Montgomery each thought he had the right-of-way and a collision occurred which resulted in this lawsuit and a jury's verdict in favor of defendants Montgomery and Sully-Miller Contracting Company but

against the defendant City of Long Beach in the sum of $2,500. From the judgment the city appeals.

The city's liability must rest upon the Public Liability Act of 1923, now codified in Government Code, section 53051: "A local agency is liable for injuries to persons and property resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition: (a) Had knowledge or notice of the defective or dangerous condition. (b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition."

The lag in the signal timing was no inadvertence; the signals were installed by the city and later were deliberately set with an eight-second delay in favor of eastbound traffic. The major contention of appellant's counsel is that the State Department of Public Works, through the Division of Highways, has exclusive control over all state highways and that the city cannot be held liable for failure to rectify the dangerous condition created by the lag in the signal because it has no power to enter upon state highway property and make a change in the timing of the signals.

In the immediate vicinity of said intersection the Pacific Coast Highway runs east and west (Redondo north and south) and only the southerly 13 feet of the highway, total width 86 feet, lie within the city of Long Beach; the portion north of that is in the city of Signal Hill.

Section 90, Streets and Highways Code, provides: "The department shall have full possession and control of all state highways and all property and rights in property acquired for state highway purposes. . . ." Section 91: "The department shall improve and maintain the state highways, including all traversable highways which have been adopted or designated as state highways by the commission, as provided in this code." Section 92: "The department may do any act necessary, convenient or proper for the construction, improvement, maintenance or use of all highways which are under its jurisdiction, possession or control." The word "maintenance" is defined by section 27 as including: ". . . (a) The preservation and keeping of rights of way, and each type of roadway, structure, and facility, in the safe and usable condition to which it has been improved or constructed, but does not include reconstruction or other improvement. (b) The necessary provision for special safety conveniences and devices." The

closing paragraph of the section is this: *"The degree and type of maintenance* for each highway, or portion thereof, shall be determined in the discretion of the authorities charged with the maintenance thereof, taking into consideration traffic requirements and moneys available therefor." While the primary authority and responsibility for maintenance and operation of state highways resides in the Division of Highways, it nevertheless has authority to delegate certain functions to the municipalities through which those highways run. Section 116, Streets and Highways Code: "The department may delegate to any such city any part of the powers and jurisdiction vested by law in the department, except the power of approval, with respect to any portion of any such State highway within such city, and may withdraw such delegation." The statute does not specify that such delegation must be formal or written and there is no reason to believe that the Legislature was interested in burdening these public agencies with unnecessary formalities. Delegation of authority concerning traffic signals and the like is also authorized by Vehicle Code, sections 465, 465.4 and 466 (now incorporated in 1959 Veh. Code, §§ 21350, 21353). The Division of Highways also has authority to enter into cooperative agreements pursuant to section 114, Streets and Highways Code: "When the commission has allocated any funds for the construction, improvement or maintenance of any portion of a State highway within a city, the department may enter into a cooperative agreement with such city for the performance of any such work by the department or by such city, or for the apportionment of the expense of such work between the department and such city." Also to grant encroachment permits to: "(a) Make an opening or excavation for any purpose in any State highway. (b) Place, change or renew an encroachment." (Sts. & Hy. Code, § 670.) Section 671 says: "Any act done under the authority of a written permit, issued pursuant to the provisions of this chapter, shall be done in accordance with the applicable provisions of this chapter, and the terms and conditions of such permit."

The Division of Highways did delegate to the city of Long Beach certain functions pertaining to the intersection in question. On July 25, 1950, it entered into an "Agreement for Maintenance" with the city of Long Beach pertaining generally to maintenance of state highways within the city and providing *inter alia*: "The City will perform such maintenance work as is specifically delegated to it and the Depart-

ment will perform those particular functions of maintenance not otherwise assigned to the city on the State highway routes or portions thereof all as hereinafter described under Sections 21 and 22 hereof or as said sections may be subsequently modified with the consent of the parties hereto acting by and through their authorized representative." Maintenance was defined as in the statute, to include: "The necessary provision for special safety conveniences and devices." The following language was also included: "The degree and type of maintenance for each highway or portion thereof, shall be determined in the discretion of the authorities charged with the maintenance thereof, taking into consideration traffic requirements and moneys available therefor." The contract further says: "Maintenance of warning and regulatory signs, traffic control devices, and highway lighting facilities as hereinafter referred to shall include upkeep and repair of the supports, as well as such other items which are an integral part of the installation." Section 16 provides for sharing of costs of maintaining and operating traffic signals, and in section 19: "The City agrees to follow such general State policies regarding encroachments as may be specified by the District Engineer." Section 22 specifies that the maintenance on this route (60(a)) shall be performed by the city so far as traffic signals are concerned. This agreement was to remain in effect until amended or terminated, neither of which events seems to have occurred.

The signals at this intersection were installed by the city; this was done pursuant to an agreement with the Division of Highways made on August 25, 1952, which provides for construction and sharing the cost thereof, also for maintenance. Section I (c) says: "The City will maintain and operate the entire traffic control signal system and highway lighting as constructed." On August 8, 1952, before the making of the last quoted contract, an encroachment permit was issued to the city authorizing the construction of this signal system and apportionment of costs. It contains this sentence: "The timing of the traffic signal system will be determined by the State." The construction was completed by the city on January 2, 1953.

Originally the signals were set so they would work simultaneously, but changes were made by the city of Long Beach in January, 1953, March, 1953, November, 1955, and December, 1955. It appears that the first change in timing was "instituted by the Police Chief of Signal Hill"; whether it

was expressly sanctioned by the Division of Highways is not affirmatively shown. Nor is there any specific evidence as to whether those of March, 1953 and November, 1955, were made with or without the order or concurrence of the division. It seems that appellant, which claims absence of authority to act in that manner, would have produced proof to that effect if those changes were not made of its own motion and without consultation with the division.

We do know, however, the manner in which the change of December 22, 1955, came about. It is the one which proximately caused the accident. It reversed the cycle established on November 30, 1955, and was prompted by complaints about the results of that timing. At the request of the engineering department of Long Beach a study was made by Mr. Morehead (traffic signal technician for Division of Highways) and Mr. Frederickson (Assistant Traffic Engineer for Long Beach). They reported independently to their superiors. Mr. Skiles, who was senior Highway Electrical Engineer of Division of Highways, telephoned Mr. Dier, Long Beach City Traffic Engineer, and recommended the change which the city made on December 22, 1955. No warning signs of any kind were installed and apparently there was no discussion about taking such a precaution although Mr. Morehead had recommended installation of a ''Watch this Signal'' sign facing westbound traffic and placed on the standards at the northwest and southwest corners.

Counsel for appellant argues that no such change was or would have been made by the city except upon an order from the Division of Highways, this because of its exclusive control of the subject. But it is worthy of note that said counsel repeatedly asked Mr. Skiles (called as the city's witness) whether he had ''recommended'' this change. After several affirmative answers and the statement that this was done in a telephone conversation, counsel for appellant asked: ''As I believe you stated, reading from the memorandum, you suggested the elimination of the leading setup and you suggested that it be replaced with a lagging setup, is that correct? A. Yes, sir. Q. Did you send them any written orders to make that change? A. This I don't recall. I rather doubt it, though. Q. So far as you can recall right now the change was merely a suggestion by your office to Mr. Dier, is that correct? A. This is the way I would have phrased it, yes.'' There is no definite evidence that any such written order or memorandum was made by the Division of Highways. The matter plainly was

handled as a joint undertaking. The closest approach to proof of the claim that this change in timing was done under order of the Division of Highways is the following testimony of Mr. Dier: "Q. By Mr. Putnam: In your capacity as City Traffic Engineer, do you have anything to do with the type of signals at intersections within the City of Long Beach? A. My duty is to make studies and make recommendations on traffic signals in Long Beach, under the control of the City. Q. Would that include the timing of automatic traffic signals? A. Yes, sir. Q. Directing your attention to the intersection of Pacific Coast Highway and Redondo Avenue, do you understand your duty to be to change the timing or alter the timing of the signals at that intersection? A. No, we don't. Q. Does your department, if it does at all, order the signal timing on that intersection pursuant to direction from any other source? . . . The Witness: The timing of the signals at Redondo and Pacific Coast Highway is done through the Public Service Department under the order of the State Highway Division." But no such order, oral or written, was produced in this instance and the witness' statement was but a conclusion, or at best a statement of custom. Whether there was such an order from the Division of Highways became a question for the jury.

Interrogatories having been propounded to the defendant before trial, same were answered by a deputy city attorney in part, as follows: "6. What city, company or agency maintains and controls the traffic control device at this intersection? . . . 6. City of Long Beach. 7. Is there any written agreement between the City of Long Beach and the State of California, or agencies of the State of California, relative to the maintenance and repair of these traffic control devices? Answer: 7. Yes, there is an agreement. 8. If your answer to the foregoing is yes, please attach a copy of this written agreement to the answer to these interrogatories. Answer: 8. Attached. 9. For what period of time prior to the 2nd day of January, 1957, was the City of Long Beach charged with the duty of maintaining and repairing these traffic control devices at the above mentioned intersection? . . . 9. From the date of the completion of the installation, January 2, 1953, to January 2, 1957." The agreement attached to the answer to interrogatory 8 is that of August 25, 1952, which says: "The City will maintain and operate the entire traffic control signal system and highway lighting as constructed." Counsel for both sides told us upon oral argument that the encroachment permit of August 8, 1952, was not discovered by the city attorney's

office or disclosed to plaintiff's attorneys until about four days prior to trial. Evidently it had little significance to Long Beach officialdom except for last minute defense purposes.

An unmistakable inference arises from the foregoing that the timing change which misled plaintiff's husband and virtually created a trap for him was made by the city of Long Beach after consultation with highway department engineers and that the work was not done under any order from the department. It was the voluntary act of the city done on its own behalf. It created a dangerous condition in public property. "It is now settled law that automatic traffic signals are included in the term property as used in the statute." (*Hoel* v. *City of Los Angeles,* 136 Cal.App.2d 295, 299 [288 P.2d 989].) Under the decisions the fact that the city itself deliberately created the dangerous condition dispensed with the necessity of the notice contemplated by section 53051, Government Code. (*Fackrell* v. *City of San Diego,* 26 Cal.2d 196, 203 [157 P.2d 625, 158 A.L.R. 773]; *Wood* v. *County of Santa Cruz,* 133 Cal.App.2d 713, 717 [284 P.2d 923]; *Ohran* v. *County of Yolo,* 40 Cal.App.2d 298, 304 [104 P.2d 700]; *Sandstoe* v. *Atchison T. & S. F. Ry. Co.,* 28 Cal.App.2d 215, 219 [82 P.2d 216]; *Johnson* v. *County of Fresno,* 67 Cal.App.2d 116, 121 [153 P.2d 557]; *Murphy* v. *County of Lake,* 106 Cal.App.2d 61, 67 [234 P.2d 712]; *Bigelow* v. *City of Ontario,* 37 Cal.App.2d 198, 204 [99 P.2d 298].) From December 22, 1955, to January 2, 1957, the city made no attempt to correct the condition it had created. At this point we are squarely confronted with appellant's contention that it had no authority to go upon a state highway and make such a correction and hence the ruling in *Gillespie* v. *City of Los Angeles,* 36 Cal.2d 553 [225 P.2d 522], requires the conclusion that it could not incur any liability for failure so to do.

The Gillespie case definitely does hold that "[i]f the city had no authority to remedy the condition of the state highway where the accident occurred it cannot be liable under the terms of the Public Liability Act for failure to do so." But the facts of that case are so different from those at bar that the decision does not control the ultimate question we must solve.

The written agreements between state and city undoubtedly delegate to the latter the entire maintenance, i.e., regulation and operation of the traffic signals, with the possible exception of the timing. The encroachment permit says: "The timing of the traffic signal system will be determined by the

State.'' There is room for doubt whether this means re-determination, as well as original determination. Certainly it does not inhibit subsequent delegation of this function either expressly or impliedly, e.g., through the agreement of August 25, 1952. The conduct of the parties is significant. For aught that appears, the city made three changes in the timing (January, 1953, March, 1953, and November, 1955) without consulting the Division of Highways. The one of December 22, 1955, followed consultation between state and city representatives, but the Division of Highways merely recommended the change, did not order it. The city's officials agreed and made the adjustment not as the agent of the division, but upon the city's own authority.[1] Whether a correction of that negligence could and should have been made by appellant of its own volition was a question for the jury in the light of all the writings and the conduct of the parties. We think it cannot be said properly that as a matter of law the city had no lawful right so to do.

The Gillespie case, *supra*, is clearly distinguishable. In that instance the alleged dangerous condition was one with which the city had had nothing to do. It was a dangerous curve in the road which had no warning signs or blinkers, and which lay outside the city limits. There had been no delegation of the state's functions with respect to the danger area. There is nothing in the opinion to suggest that a municipality may create with impunity a dangerous condition in public property so situated that it cannot correct its own misfeasance. Here the jury verdict implies a finding that there had been a delegation to Long Beach of the state's primary right to regulate the functioning of the traffic signals at an intersection lying partially in the city limits. The evidence warrants the inference that whatever the exact meaning of the encroachment permit the delegation had been made subsequently and informally through conduct of the parties.

The cases above cited (*Fackrell et al.*) which hold that no notice to the city is necessary where a dangerous condition has been deliberately created by it suggest the corollary that no reasonable time for correction is allowed; that the

---

[1] ''Where a state delegates governmental power for the performance of a state function, rather than acting directly through an agent, the agency exercises its independent authority as delegated, and must respond for its own actionable conduct as determined by the general law dealing with that class of agent and corporate activity, apart from liability on the part of the state.'' (81 C.J.S. § 131, p. 1144.) See also *Pantess* v. *Saratoga Springs Authority*, 255 App.Div. 426 [8 N.Y.S.2d 103, 105-106]; *Buck* v. *State*, 198 Misc. 575 [96 N.Y.S.2d 667, 672-673].

very creation of the dangerous condition demands immediate, not delayed, correction. "The dangerous character of the situation was such as to demand its immediate remedy." (*Huff* v. *Compton City Grammar School Dist.*, 92 Cal.App. 44, 50 [267 P. 918].) Just as the Legislature did not contemplate any notice to the city with respect to its own faulty work, so we think it intended no delay in correction of the dangerous condition created thereby.

The action sanctioned by section 53051, Government Code, is based on negligence (*George* v. *City of Los Angeles*, 11 Cal.2d 303, 308 [79 P.2d 723]), and the provision for notice to "the legislative body, board or person authorized to remedy the condition" is intended for the protection of the city, not to assist it in inflicting a wrong. The elements of notice and failure to exercise reasonable diligence ordinarily are essential to show culpability on the part of the city but where it has itself created the dangerous condition it is *per se* culpable and notice, knowledge and time for correction have become false quantities in the problem of liability. It would not seem a reasonable construction of the statute to hold that a city may create a defective and dangerous condition in property outside its limits and be absolved from liability for the consequences upon the theory that it could not correct the danger created by its own negligence. "A statute is to be construed according to the intent of the law-making body. The intent is the vital part and the primary rule of construction is to ascertain and give effect to that intent. If a statute is plain, certain and unambiguous, so that no doubt arises from its own terms as to its scope and meaning, a bare reading suffices and there is no room for construction. The mere literal construction, however, ought not to prevail if it is opposed to the intention of the legislature apparent by the act itself; and if the words are sufficiently flexible to admit of some other construction it should be adopted to effectuate the intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (*Blumenthal* v. *Larson*, 79 Cal.App. 726, 730 [248 P. 681, 251 P. 241].) See also *Freedland* v. *Greco*, 45 Cal.2d 462, 467 [289 P.2d 463]; 45 California Jurisprudence 2d, section 130, page 637.

Appellant complains of an instruction saying: "When a condition which is inherently dangerous or defective has been created through the carrying out of a plan adopted and authorized by the governing body of a City, no further proof than proof of that fact is needed to charge the City

with notice of that condition. . . ." There was no error in this as appears from the cases above cited,—*Fackrell* et al.

 Refusal of three instructions requested by defendant is urged as prejudicial error. Each of them assumes or asserts as matter of law that the city had no authority to change the timing of the signals in question. Indeed, appellant's opening brief says that "[e]ssentially, the same general proposition of law is at the root of each of the assignments of error." The above discussion shows that the refusal of these instructions was not improper. For the same reason there was no error in denial of motions for nonsuit, directed verdict and for judgment *non obstante*.

The judgment is affirmed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied March 18, 1960, and appellant's petition for a hearing by the Supreme Court was denied April 20, 1960.